UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

|  |  |
|---|---|
| FRESNO MOTORS, LLC, a California limited company; and SELMA MOTORS, INC., a California corporation;<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>MERCEDES-BENZ USA, LLC, a Delaware limited liability company;<br>　　　　Defendant. | Case No.: 1:11-cv-02000-CJC<br><br><br>**ORDER GRANTING DEFENDANT'S CONVERTED MOTION FOR SUMMARY JUDGMENT** |

## I.  INTRODUCTION

Plaintiffs Fresno Motors, LLC and Selma Motors, Inc. (collectively, "Plaintiffs") brought this action against Mercedes-Benz USA, LLC ("MBUSA"), alleging that MBUSA tortiously interfered with Plaintiffs' contractual right to purchase the assets of Mercedes-Benz of Fresno, a local Mercedes-Benz dealership ("Fresno Dealership"), from

Asbury Fresno Imports, LLC ("Asbury").  (Dkt. No. 1.)  In the operative First Amended Complaint ("FAC"), Plaintiffs allege that it executed an Asset Purchase Agreement ("APA") with Asbury to acquire certain assets in Asbury's Fresno Dealership, including Asbury's leasehold interest in the dealership premises.  (FAC ¶ 12.)  Plaintiffs allege that they were unable to close on the APA because MBUSA belatedly and unlawfully exercised its right of first refusal to purchase the dealership assets.  (*Id.* ¶¶ 28–39.)  Plaintiffs further allege that MBUSA thereafter conspired with Asbury and executed a secret agreement with Asbury acknowledging that MBUSA timely exercised its right of first refusal and additionally promising that, in the event MBUSA assigned its rights under the APA, MBUSA would purportedly guarantee the assignee's sublease under the APA.  (*Id.* ¶¶ 40–45.)  Plaintiffs, MBUSA, and Asbury thereafter engaged in negotiations to assign MBUSA's rights and obligations under the APA to Fresno Motors.  (*Id.* ¶¶ 51–53.)  During these negotiations, Plaintiffs allege that MBUSA concealed its promise to guarantee a sublease, forcing Plaintiffs to negotiate a new lease arrangement with Asbury's landlord.  (*Id.* ¶¶ 54–55.)  Negotiations between Plaintiffs, MBUSA, and Asbury eventually broke down, and Asbury terminated the APA.  (*Id.* ¶¶ 59–64.)

Based on these allegations, Plaintiffs assert five causes of action against MBUSA under California law: (1) intentional interference with existing contractual advantage; (2) intentional interference with prospective economic advantage; (3) unfair and deceptive business acts and practices under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (4) violation of California Vehicle Code section 11713.3(t); and (5) fraudulent concealment.  (Dkt. No. 23.)  Plaintiffs request, *inter alia*, compensatory, statutory, and punitive damages as well as restitution.  (FAC, Prayer.)

On November 18, 2011, MBUSA filed its renewed motion to dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Dkt. No. 29.)  The Court converted the motion to a summary judgment motion under Rules 12(d) and 56

because the Court determined that the material facts of the case were undisputed, the success of Plaintiffs' claims hinged on determination of legal issues, and additional evidence, where needed, could be submitted without further discovery.  (Ct. Order, Dkt. No. 52, Jan. 12, 2012.)  Presently before the Court is MBUSA's converted summary judgment motion, filed on February 3, 2012.  (Dkt. No. 56.)  After considering the undisputed evidence presented by the parties and the arguments of their counsel, the Court concludes that summary judgment is warranted in favor of MBUSA on all of Plaintiffs' claims.

## II.  BACKGROUND

This suit arises out of Plaintiffs' unsuccessful attempt to purchase the Fresno Dealership from Asbury pursuant to the APA.  Mercedes-Benz, a Delaware corporation licensed by the California Department of Motor Vehicles, is a subsidiary of Daimler AG and distributes Mercedes-Benz vehicles manufactured by Daimler AG.  (FAC ¶ 3 & Exh. A [APA], Appx.)[1]  Asbury, a local Mercedes-Benz dealer, owned and operated the Fresno Dealership pursuant to a Passenger Car Dealer Agreement ("PCDA") and Light Truck Dealer Agreement ("LTDA") (collectively, "Dealer Agreements") with MBUSA. (Day Decl., Exh. 1 [PCDA]; Exh. 2 [LTDA].)[2]  Asbury also operated the Fresno Dealership on premises that it leased from CAR AAG CA, L.L.C. (the "Landlord") under a Lease Agreement ("Lease"), dated April 1, 2003, for a lease term of fifteen years with two ten-year renewal options.  (Young Decl., Exh. 13 [Lease], at 2–3, secs. 1.8, 1.13.)[3]

---

[1]  In the Appendix to the APA, "manufacturer" is defined as "Daimler AG and any of its Mercedes-Benz subsidiaries."

[2]  The Declaration of Ryan P. Day ("Day Decl.") was submitted in support of MBUSA's Renewed Motion to Dismiss.  (Dkt. No. 30.)

[3]  The Declaration of Gwen J. Young ("Young Decl.") was submitted in support of MBUSA's (Converted) Motion for Summary Judgment.  (Dkt. No. 56.)

Selma Motors and Fresno Motors were prospective buyers of the Fresno Dealership. Dwight G. Nelson is the owner and president of Selma Motors and the managing member and president of Fresno Motors.  (FAC ¶¶ 1–2 & Exh. C [2nd Am. to APA].)  On March 27, 2009, Selma Motors entered into the APA with Asbury to purchase certain assets in the Fresno Dealership, including a leasehold interest in the dealership premises.  (APA; Nelson Decl. ¶ 3 & Exh. A; Undisputed Fact ["UF"] No. 1.)[4]  Selma Motors subsequently assigned its rights under the APA to Fresno Motors.  In order to purchase the Fresno Dealership from Asbury, Plaintiffs needed approval from both MBUSA regarding Asbury's sale to Plaintiffs and the Landlord regarding the transfer of Asbury's leasehold interest.  (APA, at 7.)  Plaintiffs, however, were unable to close on the APA when MBUSA exercised its right of first refusal.  Plaintiffs, MBUSA, and Asbury thereafter attempted to renegotiate a deal under the APA, but negotiations broke down, and Asbury terminated the APA in the fall of 2009.

## A.  Dealer Agreements

Prior to the events underlying this action, Asbury entered into the Dealer Agreements with MBUSA on January 1, 2007.  (PCDA; LTDA.)  The agreements were valid from the date of execution to December 31, 2011.  (PCDA, at vi; LTDA, at vi.)  As an appointed Mercedes-Benz dealer, Asbury had a nonexclusive right to buy and resell Mercedes-Benz vehicles.  (PCDA, at ii; LTDA, at ii.)  The scope of Asbury's other functions, as an authorized dealer, also included the servicing, rental, and leasing of Mercedes-Benz vehicles; use and display of Mercedes-Benz marks and products; and

---

[4]  All citations of undisputed facts are from MBUSA's Response to Plaintiffs' Separate Statement of Undisputed and Disputed Material Facts in Opposition to Defendant's (Converted) Motion for Summary Judgment ("UF").  (Dkt. No. 68.)  The Declaration of Dwight G. Nelson ("Nelson Decl.") was submitted in support of Plaintiffs' Supplemental Opposition to Defendant's (Converted) Motion for Summary Judgment.  (Dkt. No. 63.)

financing or insurance services.  (PCDA, at 37; LTDA, at 37.)  The agreements further incorporated standard provisions that furnished detailed guidance regarding the parties' rights and obligations as to the acquisition, delivery, and inventory of Mercedes-Benz vehicle products; the dealer's marketing and sales of Mercedes-Benz vehicles; the dealer's service obligations, along with MBUSA's obligations to provide service manuals and materials and field personal assistance; the dealer's service and parts organization requirements; the dealer's customer satisfaction obligations; the dealer's location and facilities requirements; MBUSA's warranty obligations; the dealer's financing, capital, and accounting requirements; and the dealer's sales reporting requirements.  (PCDA, at 1–20; LTDA, at 1–20.)  Moreover, the agreements permitted MBUSA to monitor the dealer's performance by periodically evaluating the dealer's service and parts performance, the dealer's customer satisfaction performance, and the dealer's facilities as well as by inspecting the dealer's accounts and records on a reasonable basis.  (PCDA, at 12–15, 19–20; LTDA, at 12–15, 19–20.)

The agreements additionally specified the terms and conditions for assignment. The dealer could not transfer ownership of the dealership without MBUSA's written consent.  (PCDA, at ii, 35; LTCA, at ii, 36.)  In the event of Asbury's assignment or transfer or its assets, the agreements also provided:

> MBUSA has a right of first refusal or option to purchase such assets or ownership interest, including any leasehold interest or realty. MBUSA's exercise of its right or option under this Section IX.B supersedes Dealer's right to transfer its interest in, or ownership of, the dealership. . . .  If Dealer has entered into a bona fide written buy/sell agreement for its dealership business or assets, MBUSA's right under this Section IX.B is a right of first refusal, enabling MBUSA to assume the buyer's rights and obligations under such buy/sell agreement, and to cancel this Agreement and all rights granted Dealer.

(PCDA, at 21, 22; LTDA, at 21, 22.)  Concomitant with its right of first refusal, MBUSA was permitted to assign its right or option: "MBUSA's right or option may be assigned by it to any third party and MBUSA hereby guarantees the full payment to Dealer of the purchase price by such assignee."  (PCDA, at 21; LTDA, at 21.)

### B.  Lease Agreement

Asbury operated the Fresno Dealership on premises that it leased from the Landlord under the Lease Agreement for a term of fifteen years, beginning on April 1, 2003.  (Young Decl., Exh. 13 [Lease].)  Asbury also had two ten-year renewal options under the Lease.  (*Id.* at 2, sec. 1.13.)  The Lease listed Asbury as the "Tenant" and the "Guarantor."  (*Id.* at 1, sec. 1.4.)  The Lease further provided that Asbury could not assign or sublease the Fresno Dealership premises without the Landlord's prior written consent except under certain conditions.  (*Id.* at 10, sec. 7.1.)  The Landlord's consent to any assignment or sublease, however, could not be construed as:

> (i) waiving or releasing Tenant from any of its liabilities or obligations under this Lease as a principal, (ii) waiving or releasing Guarantor from its obligations under the Guaranty, or (iii) as relieving Tenant or any assignee or subtenant from the obligation of obtaining Landlord's prior written consent to any subsequent Assignment or Sublease.

(*Id.* at 11, sec. 7.2.)

### C.  Asset Purchase Agreement

Asbury and Selma Motors executed the APA on March 27, 2009, for the sale of certain assets in the Fresno Dealership, including Asbury's leasehold interest under the Lease Agreement.  (APA.)  The APA provided that Asbury would either (a) assign the

lease to Selma Motors or (b) execute a sublease.  (APA, at 3, sec. 2.05.)  Specifically, section 2.05 of the APA states that at the closing, Asbury (the Seller) shall deliver, and Selma Motors (the Buyer) shall accept, a leasehold interest in the leased real property of the Fresno Dealership premises as follows:

> by either (the manner to be chosen in the sole discretion of the Seller): (a) an assignment to the Buyer of all right, title and interest in the Lease (with terms and conditions reasonably satisfactory to the Seller to the extent such terms and conditions apply to, or otherwise affect, such Seller, but including the full release of the Seller and/or its Affiliates) (the "Lease Assignment"), or (b) execution and delivery of a sublease for such leased real property in favor of the Buyer (with terms and conditions reasonably satisfactory to the Seller, but including a personal guarantee of the Buyer's principal and such principal's spouse securing the obligations of the Buyer under such sublease (the "Sublease").  The Lease Assignment or the Sublease, as the case may be, will be on a pass through basis such that the Buyer will be subject to the same terms and conditions in the Lease as in effect as of the date of this Agreement, without modification (except for the change contemplated in Section 7.04).

(*Id.*)  Selma Motors' obligation to purchase the dealership assets was subject to several conditions, including approval from MBUSA and consent from the Landlord:

> Section 7.03    Manufacturer Approval.  The Manufacturer shall have approved the Buyer as an authorized dealer of its products.
>
> Section 7.04    Landlord Consent.  The landlord under the Lease shall have consented in writing to the Lease Assignment or the Sublease, as selected by the Seller as contemplated in Section 2.05 . . . .

(*Id.* at 7.)  Similarly, Asbury's obligation to sell the dealership assets was subject to several conditions, including consent and release from MBUSA, assignment and assumption of liabilities by Selma Motors, and consent from the Landlord:

Section 8.03    Manufacturer Consent and Release.  The Seller shall
have obtained the Manufacturer's consent to terminate the Seller's
existing dealership agreement with the Manufacturer, the
Manufacturer's consent to releasing the Seller from all obligations
under the Seller's existing dealership agreement with the
Manufacturer, and the Seller terminating the Seller's existing
dealership agreement with the Manufacturer.

Section 8.04    Assignment and Assumption.  The Buyer executing
and delivering to the Seller, on or before the Closing Date, an
assignment and assumption agreement for the Assumed Liabilities, in
a form reasonably acceptable to the parties.

Section 8.06    Landlord Consent.  The landlord under the Lease shall
have consented in writing to the Lease Assignment or the Sublease, as
selected by the Seller as contemplated in Section 2.05.

(*Id.*)  The termination date of the APA was initially set for April 17, 2009.  (*Id.* at 11–12,
secs. 11.01(b), (c), (g).)  This date was extended to June 15, 2009 by a first, second, and
third amendment to the APA.  (FAC, Exhs. B–D; Nelson Decl. ¶¶ 5, 9, 10 & Exhs. B–D;
UF Nos. 3, 7, 8.)


Subsequent to executing the APA, Selma Motors assigned its rights and
obligations under the APA to Fresno Motors.  (FAC ¶ 19 & Exh. C [2nd Am. to APA];
Nelson Decl. ¶ 9 & Exh. C [same]; UF No. 7.)  In the assignment, the parties (which
included Asbury, Selma Motors, and Fresno Motors) agreed to the following:

Assignment to New Buyer.  The parties agree that Selma Motors[']
rights under the Agreement are hereby assigned to the New Buyer,
and the New Buyer shall be subject to the same obligations as Selma
Motors as the Buyer under the Agreement.  All references to the
Buyer in the Agreement shall mean the New Buyer.  Notwithstanding
the foregoing, the assignment and assumption of the Buyer's rights
and obligations under the Agreement by the New Buyer shall not
operate as a release of Selma Motors of its obligations as the Buyer
under the Agreement.

(2nd Am. to APA.)

**D.  Right of First Refusal and Acknowledgement Agreement**

Pursuant to the Dealer Agreements, MBUSA had a contractual right of first refusal or option to purchase the Fresno Dealership assets that superseded Asbury's right to transfer interest or ownership of the dealership.  (PCDA, at 21, 22; LTDA, at 21, 22; *see also supra* Part II(A).)  MBUSA also had a statutory right of first refusal under section 11713.3(t) of the California Vehicle Code.

On or about June 15, 2009, MBUSA notified Asbury and Selma Motors of its exercise of first refusal by sending a letter to Asbury and Selma Motors via facsimile and overnight delivery.  (FAC, Exh. E [Letter]; Nelson Decl. ¶¶ 13, 15 & Exhs. F–G; UF Nos. 11, 13.)  MBUSA stated that pursuant to its Dealer Agreements with Asbury and Vehicle Code sections 11713.3, *et seq.*, it was exercising its right of first refusal with respect to the APA and would "purchase the assets of the Fresno Dealership as more fully set forth in the terms and condition of the Sale Agreement on the same terms and for the same consideration as set forth in the Sale Agreement."  (Letter.)

On June 19, 2009, MBUSA and Asbury entered into an "Acknowledgment of and Agreement with Respect to Exercise of Right of First Refusal."  ("Acknowledgement Agreement" or "Ack. Agrmt.").  (FAC, Exh. F [Ack. Agrmt.]; Nelson Decl., Exh. T [same]; Burkhalter Decl., Exh. E [same].)[5]  The Acknowledgment Agreement states that, on June 15, 2009, MBUSA provided timely written notice to Asbury of its exercise of its right of first refusal with respect to the APA.  (Ack. Agrmt.)  The agreement also

---

[5]  The declaration of Alton Burkhalter ("Burkhalter Decl.") was submitted in support of Plaintiffs' Supplemental Opposition.  (Dkt. No. 62.)

expressly reiterated Asbury's and MBUSA's respective rights and obligations as to such exercise of first refusal, including the following provision:

> Terms of Exercise.  MB acknowledges that by its exercise of its right of first refusal, MB will be subject to the same terms and conditions under the Fresno Motors APA as such terms and conditions apply to Fresno Motors.  Further, any subsequent assignment by MB of its rights or obligations under any or all of the Fresno Motors APA and the Purchase Documents, including, without limitation, the Sublease, shall not operate as a release of MB of its obligations under such agreements.  For avoidance of doubt, MB expressly agrees that it shall be primarily responsible for the performance under the Fresno Motors APA and the Sublease.  Asbury acknowledges that MB may assign its rights and obligations under the Fresno Motors APA and the Sublease to a third party provided that MB remain primarily responsible for the performance of any such assignee with respect to the Fresno Motors APA and the Sublease.

(*Id.*; *see also* UF No. 51.)  The agreement further provided that Asbury would terminate the APA with respect to Fresno Motors, but that such termination "will not be deemed a termination of the Fresno Motors APA as such terms and conditions now apply to MB as a result of its exercise of its right of first refusal as well as to any proposed assignee of MB," and that "MB will continue to be bound by the terms and conditions under the Fresno Motors APA as if it were an original party to same as a buyer . . . ."  (Ack. Agrmt.)  Asbury sent a copy of the Acknowledgement Agreement to Plaintiffs on August 31, 2009, in the midst of Fresno Motors' renegotiations with MBUSA and Asbury to purchase the Fresno Dealership as MBUSA's assignee.  (FAC ¶ 59; Nelson Decl. ¶ 33; Burkhalter Decl. ¶ 8; UF No. 31.)

## E.  Mediation and Termination

Asbury terminated the APA with Plaintiffs on June 19, 2009.  (FAC ¶ 46; Nelson Decl. ¶ 16, Exh. H [Term. Letter]; UF No. 14.)  Fresno Motors subsequently objected to

MBUSA's exercise of its right of first refusal as untimely and unlawful.  (FAC ¶ 49; Nelson Decl. ¶ 17.)  In an effort to resolve the dispute, MBUSA voluntarily participated in mediation with Fresno Motors on July 30, 2009.  (Woerner Decl. ¶ 2; Nelson Decl. ¶ 19; Burkhalter Decl. ¶¶ 3–4; UF No. 17.)[6]  During the mediation, MBUSA agreed to assign its rights under the APA to Fresno Motors under certain conditions.  (*Id.*)  These conditions were memorialized in an email exchange, dated July 30 and July 31, 2009, between MBUSA and Fresno Motors.  (FAC, Exh. G [July 30–31, 2009 Email]; Nelson Decl. ¶¶ 25–26 & Exhs. O–P [same]; Burkhalter Decl. ¶ 7 & Exh. D [same]; UF Nos. 23–24.)  The conditions included, but were not limited to, the following:

> Mr. Nelson should provide to Asbury whatever additional documentation, if any, it requires to secure approval of the sublease[.]
>
> . . .
>
> Fresno Motors will need to agree on and sign an assignment and assumption agreement, by which MBUSA will convey its interest under its exercise of its ROFR to Fresno Motors as assignee; Fresno Motors will then close with Asbury as the buyer.

(July 30, 2009 Email.)  MBUSA and Fresno Motors negotiated and finalized an Assignment and Assumption Agreement ("Assignment") for Mr. Nelson's signature, which was transmitted to Fresno Motor's counsel on August 28, 2009.  (FAC ¶ 56; Burkhalter Decl. ¶ 9 & Exh. F [Aug. 25, 2009 Email]; Young Decl. ¶¶ 3, 9, Exhs. 1 [Aug. 30, 2009 Email & Assign. Agrmt.], 2 [Aug. 28, 2009 Email], 10 [Sept. 17, 2009 Email].)  However, Fresno Motors did not sign the Assignment.  (FAC ¶ 61 & Exh. H [Findings & Rec. re Arbit.], at 3.)

---

[6]  The declaration of Robert Woerner ("Woerner Decl.") was submitted in support of MBUSA's (Converted) Motion for Summary Judgment.  (Dkt. No. 56.)

Negotiations reached an impasse when MBUSA would not provide the Landlord with a guarantee of Fresno Motors' obligations under the sublease.  (FAC ¶¶ 53–55, 102–105; Nelson Decl. ¶ 31; UF No. 29.)[7]  Meanwhile, to relieve Asbury of its obligation as a lessee, Fresno Motors attempted to negotiate with the Landlord an assumption of Asbury's lease or a new lease with an option to purchase the entire premises.  (FAC ¶¶ 54, 103–104; Young Decl. ¶ 7 & Exh. 7; Nelson Decl. ¶¶ 31–32.)  In late September 2009, negotiations broke down when Asbury made additional demands to Plaintiffs, who declined to comply with the new terms.  (FAC ¶ 62; Young Decl. ¶¶ 10–11 & Exhs. 11–12; Nelson Decl. ¶¶ 35–36 & Exhs. Q, U, V; UF No. 33–34.)  Asbury terminated the APA thereafter in mid-October 2009.  (FAC ¶ 63.)

On December 9, 2009, Fresno Motors initiated arbitration proceedings against Asbury and MBUSA.  (Findings and Rec. re Arbit., at 3.)  Asbury agreed to submit to arbitration while MBUSA declined to do so.  (*Id.*)  On December 31, 2009, Fresno Motors filed a petition to compel arbitration against MBUSA in the Eastern District of California (Case No. 1:10-cv-00012), based on the arbitration provision under the APA.  (*Id.*; Pls.' Req. Jud. Not., Exh. 1 [Arbit. Pet.].)[8]  On March 22, 2010, Magistrate Judge Dennis Beck recommended that Fresno Motors' motion be denied on the ground that, *inter alia*, MBUSA—by exercising its right of first refusal—stepped into the shoes of Fresno Motors as buyer of Asbury's assets, such that "MBUSA became the sole buyer and there were no obligations flowing between MBUSA and Fresno Motors under the APA.  Instead, MBUSA agreed to arbitrate any dispute it may have with Asbury, not with Fresno Motors."  (Findings and Rec. re Arbit., at 5–6.)  On May 20, 2010, Magistrate

---

[7]  On September 17, 2009, after mediation and renegotiations, MBUSA agreed to a partial guarantee of Asbury's performance under the sublease.  (FAC ¶ 61; Young Decl. ¶¶ 5–6 & Exhs. 4, 5 [Guaranty of Sublease].)

[8]  Plaintiffs' Request for Judicial Notice was submitted in support of their Opposition to MBUSA's Renewed Motion to Dismiss.  (Dkt. No. 43.)  The Court takes judicial notice of Exhibit 1.

Judge Beck's findings and recommendations were adopted, and judgment was accordingly entered on the same day.  (FAC, Exh. H [J. & Order Adopting Findings].)

## F.  Procedural History

On September 8, 2011, Plaintiffs brought the instant action against MBUSA in the Northern District of California.  (Dkt. No. 1.)  Plaintiffs filed the FAC on November 4, 2011.  (Dkt. No. 23.)  On November 18, 2011, MBUSA filed a renewed motion to dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Dkt. No. 29).  On November 30, 2011, the case was transferred to the Eastern District of California, Fresno Division, by the parties' stipulation and court order.  (Ct. Order, Dkt. No. 32, Nov. 30, 2011.)[9]  Due to the collective recusal of the District Judges of the Eastern District of California, on December 21, 2011, this action was reassigned to Judge Cormac J. Carney of the Central District of California by the Ninth Circuit pursuant to 28 U.S.C. § 292(b).  (Dkt. No. 41.)

On January 12, 2012, the Court converted MBUSA's renewed motion to dismiss to a motion for summary judgment.  (Ct. Order, Dkt. No. 52, Jan. 12, 2012.)  The Court gave notice of the converted motion to the parties and afforded the parties the opportunity to submit additional evidence in support of their claims.  (*Id.*)  The Court ordered MBUSA to file a supplemental response by February 3, 2012, and ordered Plaintiffs to submit a supplemental opposition by February 10, 2012.  (*Id.*)  The Court also permitted MBUSA to submit a supplemental reply no later than February 17, 2012.  (*Id.*)  Hearing on the converted summary judgment motion was set for February 24, 2012 at 9:00 a.m.

---

[9]  On December 7, 2011, the District Judges of the Eastern District of California decided on a collective recusal of the District Judges for one year from the departure of former colleague and Judge of the Eastern District of California, Oliver W. Wanger (one of Plaintiffs' counsel in this action), in any case in which he appears as counsel, and referred the action to the Ninth Circuit Court of Appeals for reassignment to a District Judge of another district.  (Ct. Order, Dkt. No. 39, Dec. 8, 2011.)

(*Id.*)  In their responses, the Court specifically requested that the parties include briefing and additional evidence related to whether Plaintiffs can prove fraudulent concealment, particularly with regarded to the following issues: (1) whether MBUSA had a duty to disclose the contents of the Acknowledgement Agreement and (2) whether "but for" MBUSA's failure to disclose the Acknowledgment Agreement to Plaintiffs, Plaintiffs would not have engaged in negotiations with the Landlord of the Fresno Dealership premises.  (*Id.*)

On February 3, 2012, MBUSA timely filed its converted summary judgment motion.  (Dkt. No. 56.)  The parties then stipulated to a two-week extension for Plaintiffs to file their opposition to the converted summary judgment motion and to continue the hearing, (Dkt. No. 57), which the Court granted.  (Ct. Order, Dkt. No. 60, Feb. 9, 2012.)  Plaintiffs concurrently filed an *ex parte* application to extend the time for discovery and present facts under Federal Rule of Civil Procedure 56(d).  (Dkt. No. 58.)[10]  The Court denied the *ex parte* application, as the Court determined that Plaintiffs' claims, including the claim for fraudulent concealment, turn on legal issues that do not require the submission of evidence or facts not already in the parties' control or custody.  (Ct. Order, Dkt. No. 60, Feb. 9, 2012.)  Nevertheless, the Court permitted Plaintiffs in their opposition to indicate the specific reasons why additional discovery is necessary to

---

[10]  In their *ex parte* application, Plaintiffs specifically requested an extension for limited discovery on the factual circumstances related to (1) MBUSA's allegedly untimely exercise of its right of first refusal under the California Vehicle Code and (2) facts surrounding MBUSA's failure to disclose the Acknowledgement Agreement underlying Plaintiffs' fraudulent concealment claim, among other issues. (Pls.' Ex Parte App., at 4–6; Wanger Decl. ¶ 23.)  The Court does not believe that limited discovery is necessary on these issues since the determination of whether MBUSA is entitled to judgment on each of Plaintiffs' claims hinge on legal issues, as more fully discussed below.  Thus, contrary to Plaintiffs' position, the Court does not believe that due process was somehow short-circuited by denying limited discovery on tangential factual matters that are unnecessary to the resolution of the instant converted motion for summary judgment, especially in light of the procedural history of this case, extended briefing schedule, extended time for oral arguments, the opportunity for Plaintiffs' to raise the need for discovery in their supplemental briefing, and the consideration of Plaintiffs' supplemental declaration, which was submitted at the March 23, 2012 hearing (*see infra* n.9).

oppose the converted motion.  (*Id.*)  On February 27, 2012, Plaintiffs filed a timely

opposition to MBUSA's converted motion, and MBUSA submitted a reply on March 12,

2012.  (Dkt. Nos. 61, 67.)  On March 23, 2012, the Court heard extended oral arguments

from counsel for both parties.[11]

## III.  LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of

each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

The Court may award summary judgment where the pleadings, the discovery and

disclosure materials on file, and any affidavits show that "there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see

also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" when its

resolution might affect the outcome of the suit under the governing law, and is

determined by looking to the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  A factual issue is "genuine" when there is sufficient evidence such that a

reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Id.*

The party seeking summary judgment bears the initial burden of demonstrating the

absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 325; *In re Oracle

Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  Where the movant bears the burden

of proof on an issue at trial, the movant "must affirmatively demonstrate that no

reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty

Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  In contrast, where the nonmovant will

---

[11]  At the hearing, Plaintiffs' counsel requested that Plaintiffs' Supplemental Declaration of Dwight G.
Nelson in Opposition to Defendant's (Converted) Motion for Summary Judgment be admitted.  The
Court granted the request and admitted Mr. Nelson's declaration as Exhibit 1.

have the burden of proof on an issue at trial, the moving party may discharge its burden

of production by either (1) negating an essential element of the opposing party's claim or

defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that

there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*,

477 U.S. at 325.  Once this burden is met, the party resisting the motion must set forth, by

affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a

genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also Oracle Corp.*, 627 F.3d at

387.  A party opposing summary judgment must support its assertion that a material fact

is genuinely disputed by (i) citing to materials in the record, (ii) showing the moving

party's materials are inadequate to establish an absence of genuine dispute, or (iii)

showing that the moving party cannot produce admissible evidence to support its factual

position.  Fed. R. Civ. P. 56(c)(1)(A)–(B).  The opposing party may also object to the

material cited by the movant on the basis that it "cannot be presented in a form that

would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  But the opposing party must

show more than the "mere existence of a scintilla of evidence," *Anderson*, 477 U.S. at

252, or some "metaphysical doubt" as to the material facts at issue.  *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, "there must be

evidence on which the jury could reasonably find for the [opposing party]." *Anderson*,

477 U.S. at 252.


In considering a motion for summary judgment, the Court's function is not to

weigh the evidence and determine the truth of the matter or make credibility

determinations, as those are jury functions.  *Anderson*, 477 U.S. at 255.  "The evidence of

the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Id.*; *see also T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,

630–31 (9th Cir, 1987).  But conclusory and speculative testimony in affidavits and

moving papers is insufficient to raise triable issues of fact and defeat summary judgment.

*Thornhill Pub. Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  "If the

court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).

## IV.  DISCUSSION

### A.  Tortious Interference

Plaintiffs assert that MBUSA tortiously interfered with Plaintiffs' contractual relationship with Asbury and their prospective economic advantage in the Fresno Dealership.  (FAC ¶¶ 68–84.)[12]  Here, the parties agree that California law applies to the tortious interference claims.  The parties also do not take issue with the well-established principle in California that "a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract."  *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126.  Nor do the parties take issue with the California Supreme Court's holding that a

---

[12]  Under California law, the elements of a claim for intentional interference with contractual relations consist of: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elect. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).  A claim for tortious interference with prospective economic advantage is largely similar to the claim for tortious interference with an existing contractual relationship and protects the same interest in stable economic relationships, except that interference with prospective economic advantage does not require proof of a valid contract and recognizes a broader range of privilege to interfere.  *Id.*; *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1157 (2003) ("[T]he tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage." (citation and quotes omitted)).  The elements of tortious interference with prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *Korea Supply Co.*, 29 Cal. 4th at 1153 (citations and quotes omitted).  In addition to these elements, a claim for interference with prospective economic advantage requires proof that the defendant "not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself."  *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).  The intent requirement is the same for the torts of intentional interference with contract and intentional interference with prospective economic advantage.  *Korea Supply Co.*, 29 Cal. 4th at 1157.

tortious interference claim cannot lie against the party to the same contract.  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994).  Rather, the dispute at issue turns on (i) the meaning of "stranger" for the purposes of asserting a tortious interference claim and (ii) whether or not MBUSA was properly a stranger to the contractual relationship between Plaintiffs and Asbury.  MBUSA argues that Plaintiffs' tortious interference claims fail as a matter of law because MBUSA was not a stranger to the APA, as it had a direct interest and involvement in the contractual relationship between Plaintiffs and Asbury, pursuant to the "not-a-stranger doctrine" under *Applied Equipment* and *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825 (9th Cir. 2001).  (Def.'s Mem. in Supp. Mot. to Dismiss, at 10–12.)  The crux of Plaintiffs' argument is that MBUSA—as, admittedly, a nonparty to the APA between Plaintiffs and Asbury—is necessarily a stranger to the contract and is thus subject to the interference claims under the California appellate court's clarification of the not-a-stranger principle in *Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal. App. 4th 344 (2005).  (Pls.' Opp'n, at 5–8.)  Plaintiffs also rely on *Woods* for the proposition that nonparties have no right to interfere with another's contract where they only have a general economic interest in or connection to the contract.  (*Id.* at 8.)

    The Court finds that under California law, as recognized by the Ninth Circuit, a claim for tortious interference of contract and prospective economic advantage may only lie against "strangers" or interlopers who do not have a direct and significant interest in the plaintiff's contractual relationship with another individual or entity.  The Court disagrees with Plaintiffs that a nonparty to a contract is automatically subject to a tortious interference claim.  Rather, the Court finds that a tortious interference claim cannot also lie against a nonparty who has a direct economic interest and involvement in the contractual relationship.  The not-a-stranger principle, as applied to MBUSA under the undisputed facts, show that MBUSA had a substantial, continuing economic interest and

necessary involvement in the APA that was contractually recognized and statutorily protected.

### 1.  Not-A-Stranger Principle

In *Applied Equipment*, the California Supreme Court addressed the issue of whether a party to a contract could be liable in tort for conspiracy to interfere with its own contract.  *Applied Equip.*, 7 Cal. 4th at 508–509.  In that case, the plaintiff, Applied Equipment Corporation ("Applied"), entered into a subcontract with Litton Saudi Arabia Limited ("Litton") to obtain and supply spare parts that Litton needed to provide military equipment to Saudi Arabia, in exchange for which Applied would be paid a commission. *Id.* at 508.  As part of the contract, Applied agreed to purchase certain tubes from Varian Associates, Inc. ("Varian"), and with Litton's approval, Applied ordered several tubes. *Id.*  Several months after the order, Litton directly contacted Varian and negotiated a sale of tubes so that Varian would sell some of the tubes to Applied and some of the tubes to Litton at a reduced price, therefore decreasing Applied's commission.  *Id.* at 508. Applied subsequently filed suit against both Litton and Varian for breach of their respective contract with Applied (*i.e.*, the subcontract and purchase order) as well as for tortious interference with those contracts.  *Id.*  The trial court returned a verdict in favor of Applied for contract and tort damages.  *Id.* at 509.  Upon appeal, the appellate court rejected Varian's argument that it could not, as a matter of law, be held liable for tortious interference with its own contract.  *Id.*  The California Supreme Court reversed the appellate court's decision, holding that a claim for tortious interference does not lie against a party to the contract.  *Id.* at 510, 521.

The California Supreme Court based its decision, in part, on precedent and long-standing policy, including the "underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or

economic interest in the contractual relationship" and the principle that "[t]he tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." *Id.* at 514.

Although *Applied Equipment* was not specifically cited in *Marin Tug*, the Ninth Circuit in *Marin Tug* also invoked and applied the not-a-stranger principle in deciding whether the wrongfulness element of the claim for tortious interference with prospective economic advantage was satisfied. In that case, Marin Tug and Barge Inc., a barge company that transported oil, entered into a contract with a petroleum company that brokered fuel, under which one of Marin Tug's barges (the "Tenor") was loaded with oil at Shell Oil's refinery. *Marin Tug*, 271 F.3d at 827. After the Tenor was contaminated by Shell Oil, Marin Tug brought suit against Shell and the petroleum company, asserting various contract and tort causes of action. *Id.* at 827–28. After Marin Tug filed suit, Shell refused to have any further business dealings with Marin Tug and prohibited it from loading fuel at Shell's refinery, which resulted in not only Shell's refusal to contract with Marin Tug, but also Marin Tug's inability to conduct business with third-party fuel brokers and consumers who would have otherwise hired it to transport Shell's oil. *Id.* at 828. In response to Shell's refusal to do business with Marin Tug, Marin Tug amended its complaint to allege intentional interference with prospective economic advantage against Shell. *Id.* The district court granted summary judgment in favor of Shell on the tortious interference claim, and the Ninth Circuit affirmed, holding that Marin Tug and its owners could not show some unlawful element to satisfy the requisite wrongfulness element for their tortious interference claim. *Id.* at 834–35.

In reaching its decision, the Ninth Circuit relied on three core principles of California tort law, including the principle that "California law has long recognized that the core of intentional interference business torts is interference with an economic relationship by a third-party *stranger* to that relationship, so that an entity with a direct

interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests."  *Id.* at 832; *see also ViChip Corp. v. Lee*, 438 F. Supp. 2d 1087, 1097 (N.D. Cal. 2006) ("[T]he core of intentional interference business torts is interference with an economic relationship by a third-party *stranger* to that relationship."); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1070 (C.D. Cal. 2003) ("[T]he threshold test for determining whether a defendant is not a stranger to an economic relationship and thus cannot be liable for tortious interference, is whether such defendant *has a direct interest or involvement in that relationship*."); *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1572, 1688 (1997) (finding that a gasoline franchisor "has a clear financial interest in its dealers and therefore is privileged to 'interfere' with the contract."); *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal. App. 3d 13, 21 (1978) (invoking the privilege under Restatement of Torts, section 769, that "[o]ne who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor (a) does not employ improper means, and (b) acts to protect his interest from being prejudiced by the relation.").  A defendant has a "direct interest" in a business relationship when the underlying contract cannot exist without the defendant's participation or cooperation, *Marin Tug*, 271 F.3d at 834, or when the defendant stands to benefit from the contract's performance, *DIRECTV*, 318 F. Supp. 2d at 1070.

Closely intertwined with the not-a-stranger principle is the fundamental precept that a nonparty to a contractual relationship who nevertheless has a sufficiently direct economic stake in that relationship has a right to protect its own economic interest.  *See Marin Tug*, 271 F.3d at 832 (applying the principle under California law that "the tort of interference with prospective economic advantage was not intended broadly to limit individuals or commercial entities in choosing their commercial relationships, whether their motives in doing so might be—unless those motives are independently unlawful"); *see also A-Mark Coin v. Gen'l Mills, Inc.*, 148 Cal. App. 3d 312, 324 (1983) (stating that

"in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may . . . enter into secret negotiations behind the plaintiff's back, refuse to deal with him . . . or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability").

## 2. *Woods v. Fox Broadcasting Sub., Inc.*

Plaintiffs do not contest that MBUSA had a direct economic interest or involvement in the APA or in the business relationship between Plaintiffs and Asbury. Rather, Plaintiffs argue that MBUSA has misinterpreted the not-a-stranger principle under *Applied Equipment* in light of the purported clarifications of the case by the California appellate court in *Woods*. Plaintiffs argue that *Applied Equipment* and *Woods* support the proposition that because MBUSA was admittedly a nonparty to the APA between Plaintiffs and Asbury, it is necessarily a stranger, such that it is liable for tortious interference without any immunity. (Pls.' Opp'n, at 6.) The Court disagrees.

The California appellate court in *Woods* revisited *Applied Equipment* and criticized the application of the not-a-stranger principle in *Marin Tug*. In *Woods*, the plaintiffs, officers and employees of Fox Family Worldwide, Inc. ("Fox Family"), brought suit against the company's major shareholder in connection with the sale of the company. *Woods*, 129 Cal. App. 4th at 348. The plaintiffs' contract with Fox Family bound the company to certain stock options they held, and in turn, the contract required the plaintiffs to sell their stock options in the event that one of the major shareholders sold his interest in the company and in such a manner that guaranteed them 1% of the sale price of that interest. *Id.* at 347–48. Fox Family was eventually sold to Walt Disney Co. ("Disney"). *Id.* at 348. Certain obligations assumed by Disney decreased the sale price, and as a result, the plaintiffs' stock option buyout rights were substantially reduced. *Id.*

at 348.  The plaintiffs claimed that the major shareholder engineered the Fox Family-Disney deal in such a way as to cut its losses and unload undesirable obligations, with knowledge of the plaintiffs' stock option rights and with the intent to interfere with those rights.  *Id.*  Based on these allegations, the plaintiffs brought tortious interference claims against the major shareholder.  *Id.*  The shareholder later demurred to these claims on the basis that, as a holder of just under half of Fox Family stock, it was not a stranger to the plaintiffs' contracts with the company and therefore could not, as a matter of law, be liable for interfering with those contracts.  *Id.* at 349.  The trial court sustained the demurrer and found that the major shareholder was not a stranger under *Applied Equipment*.  *Id.* at 349.

The appellate court reversed the trial court's decision, finding "it highly unlikely that *Applied Equipment* intended to hold, or should be construed as holding, that persons or entities with an ownership interest in a corporation are automatically immune from liability for interfering with their corporation's contractual obligations."  *Id.* at 353.  In reaching its decision*,* the appellate court focused on *Applied Equipment*'s use of the phrase "*outsiders* who have no legitimate social or economic interest in the contractual relationship," as being only dicta and a "mystery," with no apparent connection to the issue before the appellate court.  *Id.* at 352, 353.  The *Woods* court concluded that when the *Applied Equipment* court used the term "stranger to a contract," it did so interchangeably with the terms "noncontracting parties."  *Id.* at 353.  The appellate court also rejected the interpretation that the quoted language meant that "not only were contracting parties immune from interference claims, so too were another class of defendants who, although not parties to a contract, were not true 'strangers' to the contract because they had some general interest in the contractual relationship."  *Id.* at 352.

While this Court agrees with the *Woods* court that the issue before the *Applied Equipment* court concerned liability of a party for interfering with its own contract, the Court does not believe that the phrase "*outsiders* who have no legitimate social or economic interest in the contractual relationship" was only dicta or an arbitrary turn of the phrase used by the California Supreme Court.  The *Applied Equipment* court based its holding on a longstanding underlying policy, as noted by the Ninth Circuit in *Marin Tug*. The *Woods* court did not reject this policy; rather, the court refused to apply it to the particular circumstances of the case before it in light of existing precedent involving shareholder liability for interfering with contracts between the company and third parties. *See Woods*, 129 Cal. App. 4th at 353 ("In short, neither *Applied Equipment* nor any of the authorities it relied upon when discussing the liability of third parties arose from factual settings like the one here—where a powerful shareholder allegedly interferes in a contract between the corporation whose shares it owns and some other person or entity.") Notably, the *Woods* court does not account for the clear statement just below the quoted language in *Applied Equipment*: "The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance."  *Applied Equipment*, 7 Cal. 4th at 514.  This statement suggests that the California Supreme Court deliberately applied the not-a-stranger principle and determined that parties to a contract—who clearly do have a legitimate interest in the underlying contract—are not strangers to that contract and so cannot be held liable for interference.

Likewise, the *Woods* court minimized the Ninth Circuit's observations of the not-a-stranger principle in *Marin Tug* and read that case as being limited to an evaluation of the wrongfulness element of the claim for tortious interference with prospective economic advantage.  *Woods*, 129 Cal. App. 4th at 355 ("[W]e conclude that Marin Tug did no more than evaluate the wrongfulness of Shell's conduct in the context of its relationships with Marin Tug and the tug company's customers and was not extending

immunity from contract interference claims to an even broader, more attenuated class of persons.")  However, the California appellate court also does not account for the Ninth Circuit's clear exposition of the core principles of California law relevant to tortious interference claims that undergirded the Ninth Circuit's analysis, including the not-a-stranger principle, which the Court finds applicable here.  *See Marin Tug*, 271 F.3d at 832.  Nor is the not-a-stranger principle being applied in this case to an attenuated class of persons, but, as explained below, to a manufacturer/distributer that had a substantial, continuing economic interest and necessary involvement in the contractual relationship between a prospective dealer and an existing one.

The *Woods* court and Plaintiffs further point to a caveat raised by the California Supreme Court in *Applied Equipment*.  In holding that a party to a contract could not be liable for tortious interference, the California Supreme Court noted the following: "Nothing we have said suggests that Litton may not be held liable for direct interference with the Applied/Varian purchase order (to which it was not a party) or that Varian may not be held liable for direct interference with the Applied/Litton subcontract (to which it was not a party), provided that each of the elements of the tort of interference with contract is satisfied."  *Applied Equipment*, 7 Cal. 4th at 521.  The California Supreme Court indicated that its holding did not foreclose the possibility that Litton or Varian, as nonparties, could be held liable for tortious interference of the other's contracts, *i.e.*, the purchase order and subcontract, respectively, *provided* that it satisfy each of the elements of tortious interference.  However, the California Supreme Court did not affirmatively rule—as Plaintiffs erroneously insist in focusing on this language—that Litton and Varian could, in fact, be held liable for tortious interference of the other's contract with Applied.  (*See* Pls.' Opp'n, at 7; *see also Woods*, 129 Cal. App. 4th at 353 nn. 9, 10.)  Rather, the California Supreme Court explicitly declined to analyze this issue, stating: "We offer no opinion as to whether those elements [of tortious interference] can be satisfied in this case; we hold only that Varian may not be held liable to Applied for

conspiracy to interfere with Varian's own contract—the Applied/Varian purchase order." *Applied Equipment*, 7 Cal. 4th at 521.

Based on its reading of *Applied Equipment*, the *Woods* court determined that *Applied Equipment* did not overrule the line of cases that owners or officers of a business entity could be held liable for interference with that entity's contracts, subject to the defense of privilege. *Id.* at 353. Thus, the *Woods* court concluded that *Applied Equipment* left intact the long-held "rule that owners and managers may be held liable in tort for contractual interference when they were not acting to protect the interest of the contracting party." *Id.* 353 (citation omitted). This rule is simply inapposite here. The instant case concerns whether a nonparty to a contract (a car manufacturer/distributor) may be nevertheless immune to tortious interference claims because of substantial economic interests in the underlying contract and business relationship involving the plaintiff (prospective transferee) and a third party (existing dealer). Even if the Court accepts Plaintiffs' reading of *Applied Equipment* as holding that mere economic interest is insufficient to shield a nonparty from a tortious interference claim, it does not govern situations where, as here, MBUSA alleges not some generalized economic interest, but a substantial, continuing interest that was contractually and statutorily protected.[13]

---

[13]   Additionally, Plaintiffs rely on *G&C Auto Body, Inc. v. Geico Gen. Ins. Co.*, 552 F. Supp. 2d 1015 (N.D. Cal. 2008). (*See* Pls.' Opp'n, at 8.) In *G&C*, two auto body repair shops ("G&C") sued insurance companies (collectively, "GEICO") for interference with economic relationship. 552 F. Supp. 2d at 1018. G&C alleged that the labor repair rates that GEICO used to resolve the claims of their policyholders were below the prevailing auto body rates in the region and below the alleged reasonable labor repair rates that G&C was entitled to charge for auto repair work. *Id.* at 1018. G&C alleged that GEICO was steering its policyholders away from taking their business to G&C in an effort to avoid having to pay G&C's rates. *Id.* GEICO argued that they were entitled to summary judgment on the interference claim because they were not strangers to the relationship between G&C and GEICO's policyholders. *Id.* at 1019. In doing so, GEICO relied on the line of federal cases beginning with *Marin Tug*. *Id.* The court declined to follow those federal cases, finding that *Woods* "casts serious doubt on the viability of this line of decisions for purposes of interpreting California state law." *Id.* at 1019. "In light of *Woods*, the Court is unable to conclude that, as a matter of California state law, G & C's intentional interference with prospective economic advantage claim cannot extend to GEICO merely because GEICO has an economic interest in the relationship between G & C and its policyholders." *Id.* at 1020. However, *G&C* is neither binding nor persuasive on this Court given the factual distinctions

The California Supreme Court has not offered any exposition on the *degree* of interest that a nonparty must have in a contract or business relationship to be a nonstranger.  Nor has the California Supreme Court or any California appellate court that the Court is aware of analyzed the not-a-stranger principle specifically within factual circumstances that, as here, involve a car manufacturer/distributor's purported tortious interference of a contractual relationship between an prospective dealer and an existing one.  In this situation, the Court must approximate how the California Supreme Court would adjudicate the issues.  *See  Aetna Cas. & Sur. Co. v. Sheft*, 989 F.2d 1105, 1108 (9th Cir. 1993) ("When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case."); *accord Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 885 n.7 (9th Cir. 2000).  Furthermore, "[i]n the absence of a pronouncement by the highest court of a state, the federal courts must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently."  *Owen By and Through Owen v. U.S.*, 713 F.2d 1461, 1464 (9th Cir. 1983) (citations and quotes omitted).  Here, applying the not-a-stranger principle, the Court believes that the California Supreme Court would find that MBUSA was not a stranger to the APA, given MBUSA's inextricable economic interest and involvement in the APA, as discussed more fully below.  The Court also does not believe that the California

---

between that case (involving the insurance companies' purported interference into the commercial relationship between an auto shop and the companies' policy holders) and the instant matter (involving a car manufacturer/distributor's alleged interference into the contractual relationship between an existing dealer and a prospective one where the manufacturer/distributor had to approve the assignment and had a statutory and contractual right to interfere with that contract).  Moreover, the *G&C* court did not conduct an independent analysis of *Woods* in conjunction with *Applied Equipment* and *Marin Tug* as the Court does here.  Even assuming *G&C*'s holding is correct, it is inapplicable because MBUSA did not have a general economic interest, but a substantial, continuing economic interest and necessary involvement in the APA.

appellate court's decision in *Woods* is binding on this Court in light of the Court's analysis of that case.

### 3.  MBUSA's Direct Interest and Involvement

MBUSA argues that it was not a stranger to the contractual relationship between Plaintiffs and Asbury for three reasons: (1) the entire purpose of the APA was to transfer Asbury's Fresno Dealership assets to Plaintiffs, who would then sell and service vehicles purchased from MBUSA and operate under dealer agreements with MBUSA, provided that MBUSA approved Fresno Motors as its authorized dealer; (2) a "symbiotic economic relationship" necessarily existed between MBUSA (distributor) and Asbury/transferee (dealer); and (3) MBUSA had a preexisting contractual right to interfere with the APA, based on the right of first refusal provision in the Dealer Agreements with Asbury and MBUSA's right to review and approve any transfer of the Fresno Dealership.  (*Id.* at 11–12.)  Plaintiffs do not offer any argument or evidence controverting MBUSA's significant, economic interest in the relationship between Asbury (MBUSA's existing dealer) and Plaintiffs (a prospective new one).  Plaintiffs only contend that the three grounds proffered by MBUSA for why it was not a stranger to the APA still does not change the fact that it was a nonparty to the APA.  (Pls.' Opp'n, at 14–15.)  As explained above, however, MBUSA's status as a nonparty does not necessarily mean that it is subject to a claim for tortious interference.  While "[i]t is axiomatic . . . that there can be no action for inducement of breach of contract against the other party to the contract," *Shoemaker v. Myers*, 52 Cal. 3d 1, 24 (1990), it is not true that a nonparty to the contract—by mere virtue of its status as a nonparty—is categorically subject to a claim for tortious interference.  A claim for tortious interference may still not lie against a nonparty who has a sufficiently "direct interest and involvement" in the contractual relationship.  *Marin Tug*, 271 F.3d at 833.

Based on the undisputed facts, the Court finds that MBUSA had a substantial, continuing economic interest and necessary involvement in the APA between Asbury and Plaintiffs, such that it was not a stranger to their contractual relationship.  It is uncontested that Fresno Motors could not purchase Asbury's assets of the Fresno Dealership under the APA without MBUSA's written approval, consent, and release. The APA expressly required, on or before the closing date, that Selma Motors (and later Fresno Motors as the assignee) obtain MBUSA's approval to be the authorized dealer of Mercedes-Benz vehicles.  (APA, at 7, sec. 7.03.)  In fact, the extent of MBUSA's role, as the manufacturer/distributor in approving or disapproving a prospective dealer, is codified and regulated under Vehicle Code sections 11713.3(d)(2)(A), (B).  As Plaintiffs allege, Plaintiffs had to communicate with and submit application materials to MBUSA in the process of obtaining approval as an authorized Mercedes-Benz dealer.  (FAC ¶¶ 8, 13–15.)  The APA also included, as a condition precedent, that Asbury obtain MBUSA's consent and release of its existing Dealer Agreements with MBUSA.  (APA, at 7, sec. 8.03.)  Thus, MBUSA's involvement was both necessary and integral to the consummation of the transaction contemplated by Plaintiffs and Asbury under the APA.

It is also uncontested that Plaintiffs' entire purpose of entering into the APA was to purchase Asbury's assets of the Fresno Dealership and thereby sell and service Mercedes-Benz vehicles as an authorized dealer of MBUSA.  The closing of the APA would then, in effect, create a continuing manufacturer-dealer relationship between MBUSA and Fresno Motors with certain duties and rights flowing to each under their dealership agreements and the California Vehicle Code.  For example, pursuant to the standard provisions incorporated in MBUSA's dealer agreements, the parties would have to adhere to detailed guidelines regarding the acquisition, delivery, and inventory of Mercedes-Benz vehicle products; the dealer's marketing and sales of Mercedes-Benz vehicles; the dealer's service obligations, along with MBUSA's obligations to provide service manuals and materials and field personal assistance; the dealer's service and parts organization

requirements; the dealer's customer satisfaction obligations; the dealer's location and facilities requirements; MBUSA's warranty obligations; the dealer's financing, capital, and accounting requirements; and the dealer's sales reporting requirements.  (PCDA, at 1–20; LTDA, at 1–20.)  The dealer agreements would also enable MBUSA to monitor the dealer's performance by periodically evaluating the dealer's service and parts performance, the dealer's customer satisfaction performance, and the dealer's facilities as well as by inspecting the dealer's accounts and records on a reasonable basis.  (PCDA, at 12–15, 19–20; LTDA, at 12–15, 19–20.)  As true of the manufacturer-distributor relationship, a "symbiotic economic relationship" would necessarily exist between MBUSA and Fresno Motors.  (*See* Def.'s Mem. in Supp. Mot. to Dismiss, at 11–12; *see also* PCDA at 36 & LTDA at 37 ("This Agreement is entered into by and between MBUSA and Dealer for their sole and mutual benefit."); PCDA at 6–7 & LTDA at 7 ("Dealer and MBUSA agree that customer satisfaction and the future growth of their respective businesses is substantially dependent upon the ability of owners of Mercedes-Benz [passenger cars/light trucks] to obtain high-quality servicing from Dealer.").)  As true of MBUSA's and Asbury's business relationship, MBUSA would need to depend on Fresno Motors' performance in operating the authorized dealership, and in turn, Fresno Motors would need to rely on MBUSA's distribution of Mercedes-Benz vehicles to operate the dealership.  MBUSA thereby had a substantial economic interest in the APA because it would create a manufacturer-dealer relationship with Fresno Motors—a business relationship that is closely intertwined and extensively regulated by statute.

The factual circumstances of *Marin Tug* are also instructive here.  In holding that Marin Tug and its owners could not show some unlawful element to satisfy the requisite wrongfulness element for their tortious interference claim, the Ninth Circuit noted the following: "Shell's actions were, at bottom, simply a refusal to deal with Marin Tug, and therefore presumptively valid . . . absent some unlawful element," and that it was "not dissuaded from this conclusion by the fact that in some instances the actual contracts

were between Marin Tug and the buyer, not with Shell.  Such contracts, no less than those in which Marin Tug contracted directly with Shell, required *direct, active involvement* by Shell-the loading of Shell oil onto Marin Tug's barges." *Id.* at 834 (emphasis added).  "Because the economic relationship between Marin Tug and the buyer of any Shell oil shipped on Marin Tug's barges depend[ed] on Shell's cooperation," the Ninth Circuit found that "Shell is not easily characterized as a stranger to that relationship."  *Id.*  Furthermore, the Ninth Circuit observed, as demonstrated by the underlying dispute giving rise to the lawsuit, Marin Tug and Shell had a "mutual economic interest in delivering the oil safely and cleanly, and were dependent upon each other to do so."  *Id.*  "In this situation, there is nothing wrongful under California law about the means Shell chose to advance its interests, a simple refusal to deal with Marin Tug or to load its oil on Marin Tug's barges."  *Id.*

Likewise, here, MBUSA had a direct, active role in the contractual relationship between Plaintiffs and Asbury—the distribution of Mercedes-Benz vehicles to the Fresno Dealership for sale, lease, and maintenance.  The contractual relationship between Plaintiffs and Asbury further depended on MBUSA's cooperation, *i.e.*, its explicit approval of Fresno Motors as an authorized Mercedes-Benz dealership and consent and release of Asbury's Dealer Agreements under the APA.  Moreover, as in *Marin Tug*, Asbury and MBUSA had a mutual economic interest in distributing and selling Mercedes-Benz vehicles to consumers and, as a distributor and dealer, were dependent on the other in furthering their economic interest.[14]  In fact, MBUSA's interest and

---

[14]  At bottom, the Ninth Circuit concluded that Shell's action was "simply a refusal to deal with Marin Tug," and was presumptively valid under California law, absent some unlawful element.  *Id.*  Here, too, MBUSA decided not to do business with Plaintiffs as assignees of the Fresno Dealership.  The fact that MBUSA purportedly negotiated a secret agreement with Asbury is not, alone, actionable without some unlawful conduct by MBUSA.  *See A-Mark Coin*, 148 Cal. App. 3d at 324 (stating that in the absence of some unlawful element, "a defendant seeking to increase his own business may . . . enter into secret negotiations behind the plaintiff's back" or "refuse to deal with him").

involvement in Plaintiffs' and Asbury's contractual relationship moves well beyond that in *Marin Tug*, given the necessity of MBUSA's approval of the transfer of interest, which was contractually built into the APA, and MBUSA's prospect of entering a long-term, interdependent business relationship with Fresno Motors.

There is yet another compelling reason for not viewing MBUSA as a stranger to the APA: MBUSA had a preexisting contractual and statutory right to interfere with that contract. Under MBUSA's Dealer Agreements with Asbury, MBUSA had a right of first refusal or option to purchase the Fresno Dealership assets that superseded the dealer's right to transfer interest or ownership of the dealership. (PCDA, at 21–23; LTDA, at 21–23.) MBUSA's right of first refusal permitted it "to assume the buyer's rights and obligations" under the APA. (PCDA, at 22; LTDA, at 22.) The Vehicle Code also recognizes a manufacturer's right of first refusal under certain conditions. Cal. Veh. Code § 11713.3(t). The right of first refusal permits MBUSA to step into the shoes of the prospective buyer and assume all obligations and rights, such that it displaces the buyer in the sale agreement. In other words, by exercising its right of first refusal, MBUSA becomes a *party* to the contract vis-à-vis the existing dealer (Asbury), so that it cannot be said that under *Applied Equipment* MBUSA is a stranger to the APA.[15] To hold MBUSA

---

[15] While Plaintiffs point out that MBUSA has admitted that it was *not* a party to the APA, (Pls.' Opp'n, at 5), that observation is consistent with the Court's conclusion, as MBUSA correctly stated in its opposition to Fresno Motor's petition to compel arbitration that it was never a party under the APA *with Fresno Motors*, not that it was never a party under the APA *with Asbury*. (*See* Pls.' Req. for Jud. Not., Exh. 2 [Def.'s Opp'n to Arbit. Pet.], at 6 ("What MBUSA does dispute is that it and Fresno were ever parties to the APA at the same time or, more important[ly], with consideration or obligations flowing between MBUSA and Fresno Motors . . . MBUSA instead replaced Fresno Motors as the buyer under the APA by virtue of its exercise, and agreed to be bound to <u>Asbury</u>, as the seller, to the terms of the APA, including the agreement to arbitrate any disputes under the APA with Asbury. MBUSA made no similar agreements with Fresno Motors.").) The Court takes judicial notice of Exhibit 2. Furthermore, at the March 23, 2012 hearing, Plaintiffs' counsel stated that the issue of whether MBUSA was a "stranger" to the APA was decided by Judge Ishii in his order adopting Magistrate Judge Beck's findings and recommendations regarding the Fresno Motors' petition to compel arbitration. Plaintiffs' counsel, however, mischaracterized Judge Beck's findings. Judge Beck did not deal with the issue of whether MBUSA was a stranger for the purposes of a tortious interference claim, but rather, observed that neither Fresno Motors nor MBUSA was a party or signatory of the original APA. (Findings and

liable for tortious interference for exercising its right of first refusal would further contradict a statutory right under California Vehicle Code section 11713.3(t), as the lawful exercise of every right of first refusal necessarily establishes the elements of tortious interference with contract.  (*See* Def.'s Mem. in Supp. Mot. to Dismiss, at 15.)[16]

Simply stated, MBUSA was not a stranger to the contractual relationship between Plaintiffs and Asbury.  MBUSA is thus entitled to judgment as a matter of law with respect to the tortious interference claims under the first and second causes of action.

## B.  Vehicle Code § 11713.3(t)

Plaintiffs request damages in connection with MBUSA's alleged violation of section 11713.3(t) of the California Vehicle Code by its purported untimely and unlawful exercise of first refusal and its failure to reimburse them for certain expenses.  (FAC ¶¶ 95–97.)  At issue is whether Plaintiffs have standing to assert a claim under section 11713.3(t).  MBUSA argues that Plaintiffs lack standing to bring a section 11713.3(t) claim because that section only applies to manufacturers and franchisees, and there is no private cause of action for nonlicensees, as evidenced by the express language of section 11726 of the Vehicle Code, other subdivisions of the Vehicle Code, and related legislative history materials.  (Def.'s Mem. in Supp. Mot. to Dismiss, at 19–22.)

---

Rec. re Arbit., at 5.)  Judge Beck concluded that Fresno Motor's motion to compel arbitration should be denied on the ground that, *inter alia*, MBUSA—by exercising its right of first refusal—stepped into the shoes of Fresno Motors as buyer of Asbury's assets, such that "MBUSA became the sole buyer and there were no obligations flowing between MBUSA and Fresno Motors under the APA.  Instead, MBUSA agreed to arbitrate any dispute it may have with Asbury, not with Fresno Motors."  (*Id.* at 5–6.)

[16]  In their opposition, Plaintiffs concede that a tortious interference claim cannot lie against MBUSA if MBUSA lawfully exercised its right of first refusal.  (*See* Pls.' Opp'n, at 15:18–19 ("The FAC does not seek to hold MBUSA liable for lawfully exercising a contractual ROFR.").)  As to MBUSA's exercise of first refusal, the parties dispute the timing of MBUSA's exercise, and the Court finds that this issue implicates contested facts that cannot be resolved on a motion for summary judgment.  However, the Court need not decide this issue, as it has determined that, based on the undisputed facts, MBUSA was not a stranger to the APA, such that as a matter of law, it cannot be liable for tortious interference.

Plaintiffs contend that they have a right of action as a prospective franchisee based on subdivision (t)(6) of section 11713.3, which requires reimbursement for certain expenses to "proposed transferee" of certain expenses, and attendant legislative history materials on section 11713.3(t).  (Pls.' Opp'n, at 17–21.)

Section 11713.3 renders certain conduct by licensed manufacturers and distributors unlawful.  The statute provides in relevant part:

> It is unlawful and a violation of this code for a manufacturer, manufacturer branch, distributor, or distributor branch licensed pursuant to this code to do, directly or indirectly through an affiliate, any of the following:
> . . .
>
> (t) To exercise a right of first refusal or other right requiring a franchisee or an owner of the franchise to sell, transfer, or assign to the franchisor, or to a nominee of the franchisor, all or a material part of the franchised business or of the assets of the franchised business unless all of the following [six enumerated] requirements are met.
> . . .
>
> (2) The franchisor gives written notice of its exercise of the right of first refusal no later than 45 days after the franchisor receives all of the information required pursuant to subparagraph (A) of paragraph (2) of subdivision (d).
> . . .
>
> (6) The franchisor shall reimburse the proposed transferee for expenses paid or incurred by the proposed transferee in evaluating, investigating, and negotiating the proposed transfer to the extent those expenses do not exceed the usual, customary, and reasonable fees charged for similar work done in the area in which the franchised business is located. . . . within 30 days of exercising the right of first refusal.

Cal. Veh. Code § 11713.3(t)(2), (6).

Here, Plaintiffs assert that MBUSA violated both paragraphs 2 and 6 of section 11713.3(t).  A statutory violation, however, does not necessarily give rise to a private cause of action; rather, "whether a party has a right to sue depends on whether the Legislature has manifested an intent to create such a private cause of action under the statute." *Lu v. Hawaiian Gardens Casino, Inc.*, 50 Cal. 4th 592, 596 (2010) (citations and quotes omitted).  Legislative intent is evidenced by, first, the statute's plain language and, second, if the language is ambiguous, its legislative history.  *Id.* at 596, 598.  A statute may contain "clear, understandable, unmistakable terms," which strongly and directly indicate that the Legislature intended to create a private cause of action, such as by expressly stating that a person has or is liable for a cause of action for a particular violation.  *Id.* at 597.  Alternatively, and more commonly, a statute may refer to a remedy or means of enforcing its substantive provisions.  *Id.* at 597.  "[W]hen neither the language nor the history of a statute indicates an intent to create a new private right to sue, a party contending for judicial recognition of such a right bears a heavy, perhaps insurmountable, burden of persuasion."  *Id.* at 601 (citation and quotes omitted).

It is undisputed that Plaintiffs were not existing licensees, dealers, or franchisees of Mercedes-Benz vehicles or that they had any valid agreement with MBUSA.  Instead, Plaintiffs were prospective transferees who entered into the APA with Asbury, an existing Mercedes-Benz dealer, to purchase Asbury's assets in the Fresno Dealership.  Nevertheless, Plaintiffs heavily rely on subdivision (t)(6) as evidence of the Legislature's intent to create a private cause of action for *prospective* franchise dealers because subdivision t(6) expressly requires distributors to reimburse a "proposed transferee" for certain expenses.  Plaintiffs' reliance is misplaced.

A violation of subdivision t(6) by MBUSA does not *per se* confer a cause of action on Plaintiffs.  The language of subdivision t(6) neither explicitly states a private cause of action for a prospective transferee nor permits a prospective transferee to recover

damages for a distributor's failure to reimburse it for certain expenses.  Moreover, while "proposed transferee" plainly means prospective assignees of a franchise or prospective franchisees, Plaintiffs' reading is too narrowly focused and entirely disregards the context of the statutory provision.  In interpreting a statute, the Court is guided by the Legislature's intent, as evinced by the plain meaning of the statute's words of the law. *Cal. Teachers Ass'n v. Governing Bd. of Rialto Unified School Dist.*, 14 Cal. 4th 627, 632 (1997); *see also Larry Menke, Inc. v. DaimlerChrysler Motors Co.*, 171 Cal. App. 4th 1088, 1093 (2009).  "When the language of a statute is clear and unambiguous, there is no need for interpretation and we must apply the statute as written."  *Chambers v. Miller*, 140 Cal. App. 4th 821, 825 (2006).  However, because words naturally derive their meaning from how they are used, the meaning of a statutory provision cannot be ascertained from simply reading a single word or sentence in isolation; rather, words must be construed in their context.  *See State of Cal. ex rel. Dockstader v. Hamby*, 162 Cal. App. 4th 480, 487 (2008); *Larry Menke*, 171 Cal. App. 4th at 1094.

Plaintiffs only myopically focus on subdivision (t)(6)—specifically the term "proposed transferee"—without regard to section 11713.3(t) under which subdivision t(6) is subsumed or the section's other provisions.  Subdivision t(6) must be interpreted in the larger context of section 11713.3(t), which expressly prohibits a manufacturer or distributor from exercising a right of first refusal requiring "a *franchisee* or an *owner of the franchise*" to transfer "to the franchisor, or to a nominee of the franchisor" the assets of the franchised business without satisfying certain statutory conditions.  Cal. Veh. Code § 11713.3(t) (emphasis added).  The Vehicle Code defines a "franchise" as "a written agreement between two or more persons having all of the [five enumerated] conditions," which confers on the franchisee the right to sell or lease new motor vehicles manufactured or distributed by the franchisor.  Cal. Veh. Code § 331(a).  A "franchisee" is defined as "any person who, pursuant to a franchise, receives new motor vehicles subject to registration under this code . . . from the franchisor and who offers for sale or

lease, or sells or leases the vehicles at retail or is granted the right to perform authorized warranty repairs and service, or the right to perform any combination of these activities." Cal. Veh. Code § 331.1. It is undisputed that Plaintiffs never executed a franchise agreement with MBUSA, although the parties prepared a draft Assignment and Assumption Agreement during mediation (which Fresno Motors never signed). The plain language of section 11713.3(t) indicates that a distributor cannot exercise its right of refusal with respect to a franchisee unless certain conditions are met. Subdivision (t) is consistent with the other subdivisions under section 11713.3, which expressly govern the relationship and transactions of franchisor, manufacturer, or distributor vis-à-vis an *existing* franchisee or dealer. The Court's plain reading of section 11713.3 in its entirety indicates that the statute prohibits and regulates the actions of manufacturers, distributors, and franchisors with respect to existing dealers and franchisees. There is no indication that section 11713.3 was meant specifically to encompass prospective franchisees as a protected class.[17]

---

[17] *See* subsections 11713.3(a) (requiring reasonable delivery of vehicles and parts to dealer having a franchise); (b) (regulating changes to capital structure of a dealership); (c) (regulating changes in executive management of a dealership); (d) (prohibiting the prevention or requirement of transfer of dealer's interest, except as provided under subdivision t, and requiring dealer to obtain consent from manufacturer/distributor before transfer of interest and to notify manufacturer/distributor of decision to transfer interest); (e) (prohibiting the prevention of a dealer's receipt of reasonable compensation for franchised business and requiring dealer to obtain consent from manufacturer/distributor before transfer or assignment of franchise); (f) (prohibiting receipt of benefits from third person doing business with dealer); (g) (restraining certain types of agreement, provision, release, assignment, novation, waiver, or estoppel obtained from or enforced against a dealer); (h) (regulating price increases of motor vehicles ordered by dealer) (i) (requiring payment to dealer within a reasonable time after receipt of a claim); (j) (prohibiting denial of widow or heirs designated by a deceased owner of a dealership to participate in ownership or dealership); (k) (requiring same offer of inducements to dealers); (l) (regulating franchise agreements); (n) (prohibiting denial of dealer's free association with another dealer); (o) (prohibiting competition with dealer under certain conditions); (p) (prohibiting unfair discrimination among franchisees with regard to warranty reimbursement); (s) (regulating warranty, rebate, or other incentives offered to the public or a dealer in connection with the retail sale of new motor vehicles); (u) (prohibiting unfair discrimination in favor of dealership owned or controlled by manufacturer or distributor); (v) (limiting access to information from a confidential dealer computer record) (w) (prohibiting interference with a dealer's ability to engage in certain acts by using electronic, contractual, or other means); and (x) (prohibiting certain unfair discrimination against a franchisee for not using manufacturer's or distributor's product). The remaining provisions regulate the conduct of manufacturers or distributors without reference to existing or prospective dealers. *See id.* §§ 11713.3(m)

More importantly, Plaintiffs simply fail to account for section 11726, which must be read in conjunction with section 11713.3.  *See Gately v. Cloverdale Unified School Dist.*, 156 Cal. App. 4th 487, 494 (2007) ("Statutory provisions that are in pari materia, i.e., related to the same subject, should be construed together as one statute and harmonized if possible").  Section 11726 provides as follows:

> Any *licensee* suffering pecuniary loss because of any willful failure by any other *licensee* to comply with any provision of Article 1 (commencing with Section 11700) . . . of Chapter 4 of Division 5 . . . or with any regulation adopted by the department or any rule adopted or decision rendered by the board under authority vested in them may recover damages and reasonable attorney fees therefor in any court of competent jurisdiction.  Any such licensee may also have appropriate injunctive relief in any such court.

Cal. Veh. Code § 11726 (emphases added).  Section 11726 creates a private right of action for licensed dealers and distributors to sue each other by expressly enabling a licensee to recover damages in a court of law.  Here, the term "licensee" refers to already licensed dealers and manufacturers, not prospective licensees.  *See* Cal. Veh. Code § 11700 (providing that no person shall act as a dealer, manufacturer, or distributor without having first been issued a license).  The plain wording of sections 11713.3(t) and 11726 make it clear that a cause of action for damages extends only to franchisees or dealers with an existing agreement with a manufacturer or distributor, not to a prospective transferee.  *See Larry Menke*, 171 Cal. App. 4th at 1093 (determining from the plain terms of a section of the Vehicle Code and section 11726 that a *prospective* licensee had no standing to sue manufacturer for damages under that Vehicle Code section).  There is no statutory recognition of a private right of action for damages to a prospective licensee in either section 11726 or section 11713(t), or for that matter, any other section of the Vehicle Code of which the Court is aware.

---

(prohibiting unlicensed representative); (q) (prohibiting resale of vehicles to unlicensed persons); and (r) (requiring an identification number be affixed to a park trailer).

The legislative history materials submitted by Plaintiffs do not support a different reading of subdivision (t).  In fact, the materials only show that subdivision (t) was enacted to ensure further protection to existing and newly licensed dealers against manufacturers and distributors, not to prospective dealers or franchisees.  In 1973, the Legislature enacted the "Automotive Franchise Act" to, among other things, "avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor and to insure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to consumers."  (Stats. 1973, c. 996, p. 1964, § 1; Pls.' Req. for Jud. Notice, Exh. 7 [AB 2707 re Auto. Franchise Law].)[18]  "Recognizing the disparity in bargaining power between California new car dealers and billion-dollar-multi-national auto manufacturers, the Legislature crafted the Automotive Franchise Act to shield new car dealers and the consuming public from arbitrary, capricious, and discriminatory practices by auto manufacturers and distributors."  (Pls.' Req. for Jud. Not., Exh. 7, at 1.)  The Automotive Franchise Act added a number of dealer/consumer protections, including a list of unlawful and prohibited manufacturer acts under section 11713.3, and "the creation of dealer protest rights to be adjudicated before the New Motor Vehicle Board."  (*Id.*)[19]  Section 11726 was also enacted in 1973 and enabled licensees to sue for damages, rather than merely regulatory relief from the Board, which is limited in power to investigatory and disciplinary actions.  *See Mazda Motor of Am., Inc. v. Cal. New Motor Vehicle Bd.*, 110 Cal. App. 4th 1451, 1457 (2003); *Hardin Oldsmobile v. New Motor Vehicle Bd.*, 52 Cal. App. 4th 585, 590–91 (1997).  In 1998,

---

[18]  The Court takes judicial notice of *AB 2707 (Perata, Miller, McPherson & Polanco) Re: Automotive Franchise Law*, attached as Exhibit 7 to Plaintiffs' Request for Judicial Notice.

[19]  Amendments to the Vehicle Code in 1973 empowered the New Motor Vehicle Board to adjudicate certain "dealer-distributor" disputes permitting the Board "to intrude upon the contractual rights and obligations of dealers and their product suppliers."  *Mazda Motor*, 110 Cal. App. 4th at 1458 (citation and quotes omitted).  The Board's adjudication of franchisor-franchisee disputes is authorized under section 3050 of the California Vehicle Code, but the scope of the Board's adjudicatory power is limited by the regulatory and disciplinary actions it may take.  *Id.* at 1459.

the Legislature enacted Assembly Bill No. 2707,[20] which added section 11713.3(t), (Stats. 1998, c. 662), and was intended to strengthen California's automotive franchise laws by, *inter alia*, updating and modernizing the Vehicle Code definitions of "franchise" and "franchisee" and permitting a manufacturer's or distributor's right of first refusal option if the franchisor meets certain reasonable requirements.  (Pls.' Req. for Jud. Not., Exh. 7, at 1–2, 7.)  The addition of subdivision (t) was meant to "establish a right of first refusal option in a franchise agreement and specify criteria for the reasonable use of that option."  (Pls.' Req. for Jud. Not., Exh. 6 [Assembly Comm. on Transp. Hr'g], at 4.)[21]

These legislative materials indicate that new measures were added to protect newly licensed dealers and consumers by, for example, requiring reasonable measures that manufacturers and distributors must satisfy to exercise their right of first refusal.  There is no mention of prospective dealers, franchisees, or licensees, other than perhaps as an implied part of the larger consumer public, who may bring protests before the New Motor Vehicle Board under section 3050.  Plaintiffs, however, do not purport to bring a claim for a Vehicle Code violation as part of the consuming public before the Board; rather, they seek to bring a private cause of action for damages.

If the Legislature meant to include prospective licensees as those protected under section 11726 or section 11713.3, it would have done so.  It is not the Court's role to second guess the intent of the Legislature when the express statutory language is clear on its face.  *See Calif. Teachers Ass'n*, 14 Cal. 4th at 632–33.  And the Court is not aware of any statute, decisional law, or any other authority—and Plaintiffs have furnished none— that would counsel an extension of a private right of action or create an implied right of

---

[20]  *See* A.B. 2707 (1998), attached as Exhibit 5 to Plaintiffs' Request for Judicial Notice.  The Court takes judicial notice of Exhibit 5.

[21]  The Court takes judicial notice of the *Assembly Committee on Transportation report of April 20, 1998 hearing* on A.B. 2707, attached as Exhibit 6 to Plaintiffs' Request for Judicial Notice.

action for prospective franchisees or licensees.  Because neither the language of subdivision (t) nor its legislative history suggests that there is a private right of action for a prospective dealer or franchisee, the Court finds that Plaintiffs do not have standing to sue for violation of section 11713.3(t).  MBUSA is thus entitled to judgment as a matter of law as to Plaintiffs' Vehicle Code claim under the fourth cause of action.

## C.  Fraudulent Concealment

Plaintiffs allege that MBUSA, in concert with Asbury, committed fraudulent concealment by intentionally withholding and suppressing from Plaintiffs the Acknowledgment Agreement under which MBUSA promised to be "primarily responsible" for the performance of any assignee with respect to a sublease.  (FAC ¶¶ 54, 103.)  Plaintiffs allege that MBUSA knowingly concealed this information from Plaintiffs between July 31 and August 31, 2009, forcing Plaintiffs to incur additional, unnecessary expenses in attempting to negotiate either an assumption of Asbury's lease or a new lease with the Landlord, which was unsuccessful because the Landlord would not agree to any lease without Asbury's or MBUSA's guarantee.  (*Id.* ¶¶ 103–105.)

Under California law, the elements of fraudulent concealment are: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) plaintiff was damaged by the concealment.  *Jones v. ConocoPhillips*, 198 Cal. App. 4th 1187, 1198 (2011) (citing *Kaldenbach v. Mutual of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 850 (2009)); *see also Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1011–12 (9th Cir. 2011).

### 1. Concealment of Material Fact

The Acknowledgment Agreement states that "MB expressly agrees that it shall be *primarily responsible* for the performance under the Fresno Motors APA and the Sublease." (Ack. Agrmt. (emphasis added).)  Plaintiffs' fraudulent concealment claim is predicated on the assertion that MBUSA somehow agreed in the Acknowledgment Agreement to provide a guarantee to the Landlord.[22]  Plaintiffs, however, mischaracterize the Acknowledgment Agreement.

The dispute between the parties turns on the meaning of the term "primarily responsible" under the Acknowledgment Agreement.  MBUSA argues that the promise to be "primarily responsible" for an assignee's sublease means that MBUSA would indemnify Asbury in the event the assignee failed to meet its sublease obligations to Asbury, not that it would provide a guarantee to the Landlord of the assignee's obligation under the sublease.  (Def.'s Mem. in Supp. Mot. to Dismiss, at 23–24.)  Plaintiffs insist that "[o]n its face, MBUSA's promise is a guarantee," (Pls.' Opp'n to Mot. to Dismiss, at 22:15), and that "[t]here is no practical or legal difference between promising to be 'primarily responsible for another person's obligation to perform' and guaranteeing that obligation," (Pls.' Supp. Opp'n, at 16:21–22).  To resolve this issue, the Court must apply rules of contract interpretation under California law.[23]

---

[22]  This assertion is based on two alleged facts in the FAC that are undisputed: (i) the Landlord "would not agree to any form of a lease that did not include a guarantee from Asbury or MBUSA," (FAC ¶¶ 55, 104), and (ii) Asbury, who "wanted out of its Mercedes-Benz Fresno Dealership premises lease," "would not close the transaction without MBUSA's guarantee of a Sublease if the landlord required Asbury to remain obligated under [its] Mercedes-Benz Fresno Dealership lease for the entirety of the leasehold term, including its two 10-year options" (*id.* ¶¶ 55, 104, 105).

[23]  It is interesting to note that Plaintiffs' fraudulent concealment claim assumes the enforceability of the Acknowledgment Agreement, under which Asbury and MBUSA agreed that MBUSA timely exercised its right of first refusal on June 15, 2009.  Such an assumption contradicts Plaintiffs' tortious interference claims under the first and second causes of action.  Moreover, because Plaintiffs were not parties to the Acknowledgment Agreement, they would not have standing to enforce any of the agreement's provisions against MBUSA.

1

2

### (i)  Rules of Contract Interpretation

3

"The fundamental goal of contractual interpretation is to give effect to the mutual

intention of the parties."  *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992);

*see also* Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the

mutual intention of the parties as it existed at the time of contracting, so far as the same is

ascertainable and lawful.").  Mutual intent is "determined by objective manifestations of

the parties' intent, including the words used in the agreement, as well as extrinsic

evidence of such objective matters as the surrounding circumstances under which the

parties negotiated or entered into the contract; the object, nature and subject matter of the

contract; and the subsequent conduct of the parties."  *Morey v. Vannucci*, 64 Cal. App.

4th 904, 912 (1998); *see also* Cal. Civ. Code §§ 1635–1656; Cal. Code Civ. Proc. §§

1859–1861, 1864.  When a contract is reduced to writing, the parties' intentions are

determined from the writing alone, if possible.  Cal. Civ. Code § 1639.  Unless the words

in a contract are used in a technical manner or given a special meaning, "[t]he words of a

contract are to be understood in their ordinary and popular sense," rather than their strict

legal meaning.  *Id.* § 1644; *accord Founding Members of the Newport Beach Country

Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003).  When

interpreting a contract, "[t]he whole of a contract is to be taken together, so as to give

effect to every part, if reasonably practicable, each clause helping to interpret the other."

Cal. Civ. Code § 1641.

If the contract language is capable of two different reasonable interpretations, then

the contract is ambiguous.  *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 56 Cal. App. 4th 1441,

1448 (1997).  "Under California law, the determination of whether a written contract is

ambiguous is a question of law that must be decided by the court."  *Brobeck, Phleger &

Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979); *accord Han v. Mobil Oil

Corp.*, 73 F.3d 872, 877 (9th Cir. 1995); *Wolf v. Superior Court*, 114 Cal. App. 4th 1343,

1351 (2004).  Even if the contract is unambiguous on its face, the trial court must
consider relevant extrinsic evidence that can prove a meaning to which the language of
the contract is reasonably susceptible.  *United States v. King Features Entm't, Inc*., 843
F.2d 394, 398 (9th Cir. 1988); *Abers v. Rounsavell*, 189 Cal. App. 4th 348, 356 (2010)
("[T]rial judges, acting as a gatekeeper, may take a 'preliminary look' at proffered
extrinsic evidence to determine ambiguity. . . .").  The interpretation of a contract
therefore involves a two-step process: "First the court provisionally receives (without
actually admitting) all credible evidence concerning the parties' intentions to determine
'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation
urged by a party.  If in light of the extrinsic evidence the court decides the language is
'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then
admitted to aid in the second step—interpreting the contract."  *Wolf*, 114 Cal. App. 4th at
1351 (2004) (quoting *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992)).  The resolution
of the ambiguity is also a question of law if (i) no parol evidence is admitted or (ii) the
parol evidence is not in conflict.  *Id.*

## (ii)  "Primarily Responsible" for the Sublease

The first step in the analysis is to determine whether the term "primarily
responsible" is ambiguous, *i.e.*, reasonably susceptible to the interpretation that Plaintiffs
urge—namely that MBUSA promised to provide a guarantee to the Landlord of all of
Plaintiffs' obligations under a sublease.  *Oceanside 84*, 56 Cal. App. 4th at 1448 ("When
a dispute arises over the meaning of contract language, the first question to be decided is
whether the language is 'reasonably susceptible' to the interpretation urged by the
party.")  An ambiguity does not exist merely because the parties disagree about the
meaning of a contract.  *Abers*, 189 Cal. App. 4th at 356.  Nor does an ambiguity exist
merely because a term is not defined in the contract or because "[d]isagreement
concerning the meaning of a phrase, or the fact that a word or phrase isolated from its

context is susceptible of more than one meaning." *Muzzi v. Bel Air Mart*, 171 Cal. App. 4th 456, 462–63 (2009) (citation and quotes omitted).  "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 391 (2005) (quoting *Bank of the W.*, 2 Cal. 4th at 1265).

In determining whether a contract is reasonably susceptible to the interpretation that a party urges, the Court must look to the language of the contract as well as to extrinsic evidence of the parties' intent.  *Oceanside 84*, 56 Cal. App. 4th at 1448.  The Court first examines the express language of the Acknowledgment Agreement.  The term "primarily responsible" appears twice in the Acknowledgment Agreement under subsection "Terms of Exercise."  This term is not defined separately in the Acknowledgment Agreement or capitalized to indicate that it is conferred with a special or technical meaning given in the APA.  Contrary to Plaintiffs' insistence, the Acknowledgement Agreement does not state on its face that MBUSA agreed to provide any "guarantee" to the Landlord, as neither the term "guarantee" nor the promise to provide one to the Landlord appear in the Acknowledgment Agreement.  As a result, the term "primarily responsible" must be considered in the light of all the circumstances and overall context of the agreement.  *See Wolf*, 114 Cal. App. 4th at 1352.

It is undisputed that Asbury and MBUSA executed the Acknowledgment Agreement on June 19, 2009, and that they were the only parties to the agreement.  (Ack. Agrmt.)  The Acknowledgment Agreement consists of two pages, with six full paragraphs on the first page and the parties' signatures on the second.  (*Id.*)  The agreement is entitled "Acknowledgment of and Agreement with respect to Exercise of Right of First Refusal."  (*Id.*)  The first paragraph indicates the date and the names of the contracting parties, Asbury and MBUSA.  (*Id.*)  The second paragraph provides background material on the APA, which was executed by Asbury and Fresno Motors (as

assignee of Selma Motors) on March 27, 2009, and subsequently amended.  (*Id.*)  The third paragraph provides that "[o]n June 15, 2009, MB provided timely written notice to Asbury of its exercise of its right of first refusal with respect to the transactions contemplated in the Fresno Motors APA, and its intent to purchase substantially all of the assets of Asbury upon the same terms and conditions as set forth in the Fresno Motors APA."  (*Id.*)  The paragraph continues and states that "[t]he parties now desire to acknowledge their respective rights and obligations with respect to such exercise of MB's right of first refusal as follows," and lists three such rights and obligations.  (*Id.*)  Under the fourth paragraph, subtitled "Terms of Exercise," the agreement states the core provision that includes the term "primarily responsible":

> Terms of Exercise.  MB acknowledges that by its exercise of its right of first refusal, MB will be subject to the same terms and conditions under the Fresno Motors APA as such terms and conditions apply to Fresno Motors.  Further, any subsequent assignment by MB of its rights or obligations under any or all of the Fresno Motors APA and the Purchase Documents, including, without limitation, the Sublease, shall not operate as a release of MB of its obligations under such agreements.  For avoidance of doubt, MB expressly agrees that it shall be *primarily responsible* for the performance under the Fresno Motors APA and the Sublease.  Asbury acknowledges that MB may assign its rights and obligations under the Fresno Motors APA and the Sublease to a third party provided that MB remain *primarily responsible* for the performance of any such assignee with respect to the Fresno Motors APA and the Sublease.

(Ack. Agrmt. (emphases added).)

The first sentence of the cited paragraph repeats the previous statement that by exercising its right of first refusal, MBUSA "*will be subject to the same terms and conditions under the Fresno Motors APA as such terms and conditions apply to Fresno Motors.*"  (*Id.* (emphasis added).)  By exercising its right of first refusal, MBUSA stepped into the shoes of the buyer (Fresno Motors) and assumed all of its rights and obligations

under the APA, including those under a sublease.  This language repeats the language used in section 2.05 of the APA:  "The Lease Assignment or the Sublease, as the case may be, will be on a pass through basis such that the Buyer *will be subject to the same terms and conditions* in the Lease as in effect as of the date of this Agreement. . . ."  (*Id.* (emphasis added).)

The cited paragraph from the Acknowledgment Agreement goes on to provide that in the event MBUSA assigns its rights, such assignment "*shall not operate as a release of MB of its obligations*" under the APA, including the sublease.  (*Id.* (emphasis added).) Interpreted together with the previous sentence, this provision indicates that if MBUSA assigns its right and obligations, it would still remain obligated to Asbury on par with the assignee as the buyer under the APA, including the assumption of Asbury's leasehold interest.  The next sentence then clarifies this provision:  "For avoidance of doubt, *MB expressly agrees that it shall be primarily responsible for the performance under the Fresno Motors APA and the Sublease*.  Asbury acknowledges that MB may assign its rights and obligations under the Fresno Motors APA and the Sublease to a third party *provided that MB remain primarily responsible for the performance of any such assignee with respect to the Fresno Motors APA and the Sublease*."  (*Id.* (emphases added).) When read in its entirety, this provision indicates that if MBUSA assigns its right under the APA, it would still remain "primarily responsible" under the APA and sublease as if it were the original buyer, such that the assignment "shall not operate as a release of MB of its obligations."  To remain obligated under the sublease would require MBUSA to remain obligated to Asbury, not to the Landlord.[24]

---

[24]  This retention of responsibility is entirely consistent with section 2.05 of the APA, which provides that a sublease would include "a personal guarantee of the Buyer's principal and such principal's spouse securing the obligations of the Buyer under such sublease."  (APA, at 3, sec. 2.05.)  In the event of a sublease, Fresno Motors' principals (*i.e.*, Mr. Nelson and his spouse) were obligated to provide a personal guarantee to Asbury of Fresno Motors' performance of the sublease obligations.  It does not mean, however, that Mr. Nelson would provide a guarantee of the sublease to the Landlord, as no contractual relationship exists between Mr. Nelson and the Landlord.

Additionally, the fifth paragraph under the Acknowledgement Agreement, subtitled "Termination with Fresno Motors," states that Asbury intends to terminate the APA with Fresno Motors, but that this is not a release of MBUSA's obligations, and "*MB will continue to be bound by the terms and conditions under the Fresno Motors APA as if it were an original party to same as a buyer*."  (*Id.* (emphasis added).)  This provision underscores the same message throughout the Acknowledgment Agreement: that in exercising its right of first refusal, MBUSA will take Fresno Motor's place as the buyer and assume all of Fresno Motor's rights and obligations, including those under the sublease, and that by assigning its right, it will continue to remain obligated to Asbury for the assignee's performance of the sublease.  Under the APA, it is uncontested that the obligations of the buyer (Fresno Motors) were to the seller (Asbury); accordingly, in assuming the buyer's place, MBUSA's obligations were to Asbury, not to the Landlord.

In short, the Acknowledgment Agreement simply reiterates MBUSA's existing obligations in exercising its right of first refusal under the APA: by exercising its right of first refusal, MBUSA stepped into the shoes of the buyer, Fresno Motors, and assumed the buyer's obligations to Asbury, which included the obligation to assume the leasehold interest as either an assignment or sublease under the terms and conditions of the APA. Thus, from the examination of the Acknowledgment Agreement's language in its proper context and circumstances, the Court does not find that the term "primarily responsible" is reasonably susceptible to mean a guarantee to the Landlord of Plaintiffs' obligations under a sublease.  Plaintiffs seize on the phrase that MBUSA shall remain "primarily responsible" in isolation, without proper regard to its context in the agreement, and more importantly, without properly considering *to whom* the guarantee is owed.

The Court next takes a preliminary look at the additional extrinsic evidence offered by the parties.  Both parties rely on section 2787 of the California Civil Code, which states that a guarantor, which is used synonymous with a surety, is "one who promises to

answer for the debt, default, or miscarriages of another."  Cal. Civ. Code § 2787.
MBUSA also additionally relies on the definition that a guarantee contract "involves a
direct promise to perform the obligation of the principal in the event that the principal
fails to perform as required by his contract."  *Pasternak v. Boutris*, 99 Cal. App. 4th 907,
931 (2002).  Neither is helpful because the definitions do not use the term "primarily
responsible," and although it appears that the terms "primarily responsible" and
"guarantee" may be interchangeably used to signify some sort of obligation, the
definitions do not capture the transfer and assumption of obligations between the parties
in the context of the Acknowledgment Agreement—which was essentially between the
buyer to Asbury, not from the buyer to the Landlord.

Plaintiffs have not pointed to any further legal authority or extrinsic evidence that
suggests that the term "primarily responsible" is reasonably susceptible to mean a
guarantee to the Landlord.  The only extrinsic evidence that Plaintiffs cite in support of
its interpretation of the term "primarily responsible" is an email from Asbury's counsel to
MBUSA's and Plaintiffs' counsel on August 31, 2009, stating that it was Asbury's belief
that MBUSA promised to guarantee the sublease.  (Pls.' Supp. Opp'n, at 17, citing
Nelson Decl., Exh. S.)  Specifically, the email states:

> Asbury was willing to allow . . . assignment so long as MBUSA
> remained the primary responsible party with respect to the obligations
> under both the APA and sublease.  This is all clearly provided for in
> the Acknowledgment [Agreement] which is attached for convenience.
> . . . MBUSA has indicated that it will not be responsible for the
> assignee's obligations under the APA and it will only be responsible
> for a very limited portion of the sublease obligations.  That is clearly
> inconsistent with the terms of the documents, and any assignment
> without the benefit of a full guaranty is ineffective under the APA as
> assumed by MBUSA.

(Nelson Decl., Exh. S.)  This communication is not relevant evidence of mutual intent.  Rather, it is only evidence of Asbury's *de facto* interpretation and understanding of the terms of the Acknowledgment Agreement well after the agreement was executed.  Even if it is probative of Asbury's subjective intent, as Plaintiffs suggest, (Pls.' Supp. Opp'n, at 17), there is no evidence that Asbury expressed this intention to MBUSA at or near the time it executed the Acknowledgment.  *See* Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . ."); *Shaw v. Regents of Univ. of Cal.*, 58 Cal. App. 4th 44, 55 (1997) ("The true intent of a contracting party is irrelevant if it remains unexpressed.").  The email is also irrelevant and not competent extrinsic evidence because, although intent determines the meaning of a contract, Cal. Civ. Code §§ 1636, 1638, California recognizes the objective theory of contracts, under which "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation."  *Berman v. Bromberg*, 56 Cal. App. 4th 936, 948 (1997) (citations and quotes omitted); *Winet*, 4 Cal. App. 4th at 1166 n.3 (observing that evidence of subjective intent is not "*competent* extrinsic evidence, because evidence of undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language"); *see also id.* at 1166 ("It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce."); *Founding Members*, 109 Cal. App. 4th at 956 ("The parties' undisclosed intent or understanding is irrelevant to contract interpretation.")

Having examined the terms of the Acknowledgment Agreement and Plaintiffs' extrinsic evidence for the purposes of deciding ambiguity, the Court determines that the term "primarily responsible" used in the context of the agreement is not reasonably susceptible to Plaintiffs' interpretation.  The Acknowledgment Agreement did not express a promise by MBUSA to provide the Landlord with a guarantee of the assignee's performance under a sublease.  Rather, as eponymously expressed in the title of the

agreement, MBUSA and Asbury acknowledged their existing rights and obligations with respect to MBUSA's exercise of its right of first refusal, including the obligation to assume Asbury's leasehold interest.  In the event of an assignment, MBUSA agreed to the status quo—*i.e.*, to "*remain* primarily responsible," (Ack. Agrmt. (emphasis added)), under the APA and the sublease.  Such an obligation did not include a guarantee obligation to the Landlord.  Plaintiffs latch onto the phrase "primarily responsible" in the abstract and impute a meaning onto the Acknowledgment Agreement that is unsupported by the language of the agreement, its context, or any extrinsic evidence.  Plaintiffs cannot simply manufacture an ambiguity through obfuscation and isolated reading of contractual language and present that as a genuine issue of material fact.  Because MBUSA did not conceal an agreement to provide a guarantee to the Landlord, Plaintiffs cannot prove the first element of their fraudulent concealment claim.[25]

## 2. Duty to Disclose

Plaintiffs' fraudulent concealment claim also falters under the second element of the claim.  A duty to disclose a material fact arises under four circumstances: (i) where a fiduciary relationship exists between the parties; (ii) "when the defendant had exclusive knowledge of material facts not known to the plaintiff"; (iii) when the defendant "actively conceals" a material fact from the plaintiff; and (iv) when the defendant "makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (citation and quotes omitted); *accord Deteresa v. Am. Broad. Cos., Inc.*, 121 F.3d 460, 467 (9th Cir. 1997).  Where there is no fiduciary

---

[25]  Plaintiffs argue that their fraudulent concealment claim is further predicated on MBUSA's concealment of not only the terms of the Acknowledgment Agreement, but the existence of the Acknowledgment.  (Pls.' Opp'n, at 22, citing FAC ¶¶ 105, 106.)  However, Plaintiffs plead no allegation in the FAC as to the materiality of the mere existence of the Acknowledgment Agreement and whether but for MBUSA's concealment of this fact, Plaintiffs would not have entered into negotiations with the Landlord.

relationship, "[e]ach of the other three circumstances . . . presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise." *LiMandri*, 52 Cal. App. 4th at 336–37. "[S]uch a relationship can only come into being as the result of some sort of *transaction* between parties," such as the relationship between a seller and buyer, employer and prospective employee, doctor and patient, or parties entering into a contractual agreement. *Id.*

Plaintiffs do not contest MBUSA's assertion that it was not in a fiduciary relationship with Plaintiffs. (Def.'s Mem. in Supp. Summ. J., at 9–10.) A fiduciary relationship exists where "confidence is reposed by one person in the integrity of another," and arises in such contexts as trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventurers, and agent/principal. *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 29–30 (2003). The Court agrees with MBUSA that MBUSA and Plaintiffs were not in a fiduciary relationship, as it is undisputed that they were engaged in arms-length commercial negotiations. Thus, the first circumstance under *LiMandri* does not apply.

Nevertheless, it is also undisputed that Plaintiffs and MBUSA were engaged in a *transaction*, as they were in the midst of negotiating the assignment of MBUSA's rights and obligations under the APA, although Fresno Motors never executed the proposed Assignment and Assumption Agreement. A duty may therefore arise if MBUSA had "exclusive knowledge of material facts not known" to Plaintiffs; MBUSA "actively conceal[ed]" a material fact from Plaintiffs; or MBUSA made "partial representations" but also suppressed some material facts. *LiMandri*, 52 Cal. App. 4th at 336. The Court finds that none of the three circumstances are satisfied here because the purported concealed facts of the Acknowledgment Agreement were already disclosed to Plaintiffs and readily discoverable. *Goodman v. Kennedy*, 18 Cal. 3d 335, 347 (1976) ("A duty of disclosure . . . may exist when one party to a transaction has sole knowledge or access to

material facts and knows that such facts are not known to or reasonably discoverable by the other party.")  As discussed above, the alleged secret contract that MBUSA supposedly failed to disclose to Plaintiffs merely acknowledged existing rights and duties under MBUSA's right of first refusal—*i.e.*, that once it exercised its right of first refusal, it stepped into the shoes of the buyer (Fresno Motors) and assumed its rights and obligations, including those under a sublease.  (*See* APA, at 3, sec. 2.05 (providing that in a "Lease Assignment or the Sublease, as the case may be, . . . the Buyer *will be subject to the same terms and conditions in the* Lease as in effect as of the date of this Agreement. . . ."  (emphasis added).)  These facts were already disclosed to Plaintiffs because the terms of their rights and obligations were already stated in the APA, which Plaintiffs executed on March 27, 2009, and subsequently amended, well before it entered into negotiations with the Landlord.[26]  Thus, at the time it entered negotiations with the Landlord, Plaintiffs already knew that MBUSA had exercised the right of first refusal and become "primarily responsible" for the obligations under a sublease pursuant to the terms and conditions expressly provided in the APA.  The Acknowledgment Agreement simply affirmed this fact.  It did not state anything that Plaintiffs did not already know or that was not readily discoverable.

MBUSA could not have fraudulently concealed a fact from Plaintiffs that they already knew or was disclosed to them.  Because the fact that was purportedly concealed—MBUSA's promise to Asbury to be "primarily responsible" for the sublease—was already disclosed to Plaintiffs under the APA, it was not within MBUSA's "exclusive" knowledge to implicate a duty to disclose this fact.  Likewise, a party cannot actively or partially conceal a fact already disclosed, readily discoverable, and notorious.  Accordingly, MBUSA did not have a duty to disclose the

---

[26]  MBUSA's right of first refusal was also known or at least readily discoverable to Plaintiffs because it is codified in section 11713.3(t) of the Vehicle Code and explicitly referenced in MBUSA's June 15, 2009 letter to Plaintiffs and Asbury stating that it was exercising its right of first refusal.  (Letter; Nelson Decl. ¶¶ 13, 15 & Exhs. F–G; UF Nos. 11, 13.)

1    Acknowledgment Agreement under the remaining circumstances articulated in *LiMandri*.

2    Plaintiffs therefore also cannot satisfy the duty element of fraudulent concealment, and

3    MBUSA is entitled to judgment as a matter of law on Plaintiffs' fifth cause of action for

4    fraudulent concealment.

5

6        **D.  Unfair Competition (UCL)**

7

8        Plaintiffs allege that MBUSA engaged in unlawful competition by: (i) aiding,

9    abetting, and conspiring with Asbury in the breach of Asbury's contractual obligations to

10   Plaintiffs; (ii) providing unlawful notice, in violation of Vehicle Code section 11713.3(t);

11   (iii) inducing Asbury to terminate its deal with Plaintiffs on June 19, 2009; and (iv)

12   fraudulently concealing the Acknowledgment Agreement from Plaintiffs.  (FAC ¶ 86.)

13   Plaintiffs allege that such acts are "unlawful" and "unfair" within the meaning of the

14   UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  (*Id.* ¶¶ 87–88.)

15

16       The UCL prohibits an entity or an individual from engaging in "unfair

17   competition," defined as "any unlawful, unfair or fraudulent business act or practice."

18   Cal. Bus. & Prof. Code § 17200.  The UCL provides a separate theory of liability under

19   the "unlawful," "unfair," or "fraudulent" prong.  *Lozano v. AT & T Wireless Servs., Inc.*,

20   504 F.3d 718, 731 (9th Cir. 2007).  Section 17200 borrows violations of other laws and

21   treats them as unlawful practices that are independently actionable under the UCL.

22   *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992).  Here, Plaintiffs' UCL

23   claim is predicated on its claims for tortious interference, violation of section 11713.3(t)

24   of the Vehicle Code, and fraudulent concealment.  (FAC ¶ 86.)  Because the Court has

25   determined that MBUSA is entitled to judgment on all these claims, MBUSA is also

26   entitled to judgment as a matter of law on the UCL claim.[27]

27

28   [27]  Plaintiffs additionally allege a UCL claim based on the allegation that MBUSA conspired with
     Asbury "in the breach of Asbury's contractual obligations to Selma Motors and Fresno Motors."  (FAC

Additionally, the Court agrees with MBUSA that Plaintiffs lack standing to bring a UCL claim because they have not properly alleged a basis for relief.  (*See* Def.'s Mem. in Supp. Mot. to Dismiss, at 16–19.)  Under the Constitution's requirement for standing, the plaintiff must show an "injury in fact" that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Relief for claims under the UCL is "generally limited to injunctive relief and restitution."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 179 (1999); *see also* Cal. Bus. & Prof. Code § 17203 ("The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.")  After the passage of Proposition 64 in 2004, "[t]o have standing to assert a claim under the UCL, a plaintiff must have 'suffered injury in fact and [have] lost money or property as a result of such unfair competition.' "  *Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 802 (2006) (quoting Cal. Bus. & Prof. Code § 17204); *see also Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227 (2006).

Here, Plaintiffs did not request injunctive relief in the FAC.  Rather, Plaintiffs seek to recover, as restitution, "all sums actually paid to MBUSA, or by which MBUSA has benefitted, resulting from MBUSA's unlawful, unfair and deceptive conduct" alleged in

---

¶ 86.)  A conspiracy "is not a cause of action, but a legal doctrine that imposes liability on a person who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."  *Applied Equipment*, 7 Cal. 4th at 510–11.  Standing alone, conspiracy does not give rise to a cause of action unless a civil wrong has been committed resulting in damages.  *Id.* at 11; *see also Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 44 (1989).  The underlying tort that Plaintiffs allege is Asbury's purported breach of its contractual obligations; however, Asbury is not a defendant in this action, and there is no breach of contract claim against MBUSA.  Nor, as MBUSA points out, have Plaintiffs alleged any nonconclusory facts of a "common scheme or plan" between Asbury and MBUSA in the FAC or introduced any extrinsic evidence in support of such a conspiracy.  (*See* Def.'s Reply in Supp. Summ. J., at 9.)  Thus, MBUSA's purported conspiracy in inducing the breach of Asbury's contractual obligation cannot form the basis of a UCL claim.

the FAC.  (FAC ¶ 90; *see also id.*, Prayer.)  Plaintiffs allege that "these sums include, but are not limited to, *benefits* MBUSA derived from Plaintiffs' evaluation, investigation and negotiation of the APA with Asbury, as well as *benefits* MBUSA derived from Asbury's eventual sale of the Mercedes-Benz Fresno Dealership to another party after Asbury terminated the deal for a second time in October 2009."  (*Id.* ¶ 90 (emphases added).)  A restitution order against the defendant, however, "requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 336 (2011); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003) ("Under the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest.").  "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest."  *Korea Supply Co.*, 29 Cal. 4th at 1149.

In the FAC, Plaintiffs do not allege any sums Plaintiffs or any other party paid to MBUSA.  Nor do Plaintiffs identify any property or money lost that MBUSA has acquired or a benefit obtained by MBUSA in which Plaintiffs have an ownership interest.  Rather, Plaintiffs only allege benefits that MBUSA derived (i) from Plaintiffs' evaluation, investigation, and negotiation of the APA with Asbury and (ii) benefits from Asbury's sale of its dealership to another party.  (FAC ¶ 90.)  Such unspecified, intangible benefits are not recoverable in restitution—*i.e.*, money, property, or benefits in which Plaintiffs had an ownership interest, as indicated by Plaintiffs' own cited authority. *See Korea Supply Co.*, 29 Cal. 4th at 1148–49; Cal. Bus. & Prof. Code § 17203 ("The court may make such orders or judgments . . . as may be necessary to restore to any person in interest any *money or property, real or personal*, which may have been acquired by means of such unfair competition." (emphasis added)); Cal. Bus. & Prof. Code § 17204 ("Actions for relief pursuant to this chapter shall be prosecuted . . . by a

person who has suffered *injury in fact and has lost money or property* as a result of the

unfair competition." (emphasis added)).

    In their opposition, Plaintiffs argue that "[t]he term 'benefit' denotes any form of

advantage," (Pls.' Opp'n, at 16:26), but cite no legal authority for this rule.  Plaintiffs rely

on *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1339 (2009), for the proposition

that "[f]or a benefit to be conferred, it is not essential that money be paid directly to the

recipient by the party seeking restitution."  (*Id.* at 16–17 (citing *Troyk*, 171 Cal. App. 4th

at 1340)).  However, that language from *Troyk* quotes from another case and must be

interpreted within the factual context of the *Troyk* court's holding.  The *Troyk* court held

that the insurer defendant could be liable for restitution for *indirect* receipt of service

payments made by insured plaintiffs because the money was paid to the insurer's wholly

owned subsidiary and the insurer and subsidiary were treated as a single enterprise, such

that the payments to the subsidiary "should be treated as if paid to" the insurer.  *Id.* at

1340.  While the Court agrees with Plaintiffs that money need not be paid directly to

MBUSA for restitution, Plaintiffs do not assert any indirect monetary sum obtained by

MBUSA from Plaintiffs, via a closely affiliated third party, as a result of MBUSA's

alleged unlawful and unfair acts.

    Moreover, as both parties agree, the disgorgement of what MBUSA has

"benefited" as a result of its alleged unlawful and unfair acts, in itself, is not restitution.

*See Korea Supply*, 29 Cal. 4th at 1148 ("[A]n order for restitution is one compelling a

UCL defendant to return money obtained through an unfair business practice to those

persons in interest from whom the property was taken, that is, to persons who had an

ownership interest in the property or those claiming through that person." (citation and

quotes omitted)); *Palmer v. Stassinos*, 348 F. Supp. 2d 1070, 1088 (N.D. Cal. 2004)

("[N]onrestitutionary disgorgement of profits obtained by means of an unfair business

practice is not an available remedy in either an individual or representative action under

the UCL.").  Rather, Plaintiffs must identify money or property *that they owned*, which was unlawfully, unfairly, or fraudulently obtained by MBUSA.  Plaintiffs do not plead such an allegation in the FAC.  Nor have Plaintiffs furnished evidence of property or money that they lost but was wrongfully acquired by MBUSA in their supplemental papers.  Thus, restitution is not an available remedy here, and Plaintiffs' UCL claim also fails because of a lack of standing.

## V.  CONCLUSION

For the foregoing reasons, MBUSA's converted motion for summary judgment is GRANTED.


DATED:     March 27, 2012

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE